**Harold Coleman HALL, Petitioner–Appellant,**

v.

**DIRECTOR OF CORRECTIONS; California State Attorney General, Respondents–Appellees.**

No. 02–55758.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2003.

Filed Sept. 8, 2003.

William J. Genego, Nasatir, Hirsch, Podberesky & Genego, Santa Monica, CA, for the petitioner-appellant.

Mary Sanchez, Supervising Deputy Attorney General, Los Angeles, CA, for the respondents-appellees.

Before: LAY,* HAWKINS and TALLMAN, Circuit Judges.

PER CURIAM Opinion; Dissenting Opinion by Judge TALLMAN.

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

PER CURIAM:

In 1990, California state prisoner Harold Coleman Hall was convicted by a jury of first degree murder for the killing of Nola Duncan.[1] The conviction was based almost entirely on Hall's confession, obtained while Hall was in custody for an unrelated crime. The confession, however, was rather suspect, as the subsequent police investigation revealed that various aspects of it were clearly untrue. Unable to find any physical evidence to connect Hall to the murder, the prosecution relied upon two documents provided by a jailhouse informant, Cornelius Lee, to corroborate Hall's confession. These "jailhouse notes" were admitted at trial without testimony by the informant as to their authenticity.

The notes purported to be a series of questions and answers between Lee and Hall; after the trial, however, Lee confessed he had submitted innocent or innocuous questions to Hall and then erased and altered them after Hall had written his answers in order to make them incriminating.[2] Expert testimony confirmed that erasures had been made on the documents. After hearing testimony regarding the falsification of the jailhouse notes, the state trial judge who had originally tried the case concluded that a new trial was necessary. The California Court of Appeal reversed, finding that Hall had not proven the notes were false, apparently believing the state trial judge had not found falsity either. Today we hold that the California Court of Appeal's decision was an unreasonable determination of the facts in light of the evidence presented to the state court. The falsification of this material evidence violated Hall's due process rights, and a new trial is required.

I.

Hall was taken into custody on August 17, 1985, for a robbery unrelated to the Duncan murder. He was placed in an area of the jail known as "informant's row." On September 5, 1985, based on information received from informants, police interviewed Hall regarding his possible involvement in Duncan's murder. Hall told Detective Crocker that while visiting a friend at 48th and Vermont, he observed the body of a dead female in the alley. Hall also stated that two days later, while talking with Jerry Knox and Terry Ross at a beauty salon, he heard Knox brag that he had killed a woman and dumped her body in an alley.

On September 9, 1985, Crocker interviewed Hall and showed him two photo lineups containing pictures of Knox and Ross. Hall correctly identified the photos of Knox and Ross. During this interview, Hall told the detective that Knox and Ross had raped and stabbed Duncan. He stated that he was in the car with Knox and Ross when they transported Duncan's body and dumped it in the alley.

Detectives Crocker and Arneson subsequently discovered that Knox was in prison at the time of the murders. On September 11, 1985, Detectives Crocker and Arneson interviewed Hall again at the jail. For the first time, the police gave Hall *Miranda* warnings. They thereafter confronted him with this information, and told

---

1. Hall was also convicted of the second degree murder of David Rainey and the jury found the special circumstances of murder during the commission of a rape and multiple murders. This conviction and the special circumstances were later overturned on appeal for insufficiency of the evidence. *People v. Hall*, B062985 (Cal.App. April 7, 1994).

2. For example, Lee testified that he changed the question "Homeboy, do you think you're going to get any time on the case, the robbery case," to which Hall had responded "possible," to read "After you guys killed the gril [sic], did you and V–Dog kill her brother two [sic]?"

him they knew he was lying. This time Hall implicated himself in the murder, stating that he arrived at the beauty shop at 47th Street and Vermont in the early morning hours on June 27, 1985. Duncan was being held there in a back room by four men, one of whom was Terry Ross. Hall and the other men took turns raping Duncan. The other men took turns stabbing Duncan. Hall stabbed Duncan twice in the arm. The men then placed Duncan's body in the trunk of a car and three of them, including Hall, drove to the alley and dumped the body there. Hall gave a description of the position of the body that matched the police crime scene description. The men then discussed returning to kill Rainey, because he knew that his sister, Nola Duncan, was with them. Hall left the group at that point and heard later that Rainey had been killed. Detective Crocker reduced this statement to writing, and Hall signed it.

On September 20, 1985, Detective Arneson was given two documents by Lee, an inmate on "informant's row" in Los Angeles County Jail. The two documents were notes which Lee indicated had been passed back and forth between himself and Hall, with Lee posing questions and Hall answering them. The contents of the notes, including spelling and grammatical errors, were as follows:

Q: "After you guys killed the gril, did you and V–Dog kill her brother two[?]"

A: "possible."

Q: "Okay, befor you guys killed her. Did she in joy you makeing her make love to you how could you tell[?]"

A: "Cause she was saying she did."

Q: "Hey, home boy the police want you and V–Dog bad for killing that gril on 49th and Vemout. Listing you are going to have to stop tell people that you killed that gril. Okay when you guys put her in alley, who seen her[?]"

A: "Everybody was their the whole Neabior Hood even old people."

Q: "Did you killing that gril on 49th and Vermout. And why did you tell the ploice they know you did it[?]"

A: "(That yes) because they said They will book me if I ly."

(E.R. at 252.)

At trial, the defense offered evidence that Hall's two oral statements were contradictory, and his written statement contained multiple facts that contradicted evidence from the crime scene. According to Hall's written confession, Todd Smith initiated and directed Duncan's rape and murder, and her body was transported in Smith's car from the beauty parlor to the alley. Smith was questioned by Detective Arneson. Smith admitted knowing Hall, but denied any knowledge of or involvement in the murders. Smith's car was examined by police; his tires did not match the prints of those found in the alley, and a forensic examination of his car did not reveal any evidence linking it to the crime or to Hall. Smith was never arrested or charged.

According to Hall's confession, the back room of the beauty parlor where Duncan was raped and murdered was at 47th and Vermont. At trial, the owners of the beauty salon at that location testified that it had no back room, and that there had never been signs of a forced entry, or blood, or evidence of any bizarre occurrence. The owners testified that they were not contacted by police. Detective Arneson testified that he did not search the beauty salon because he never believed it was the scene of the crime.

Hall's confession stated that Duncan was repeatedly raped prior to her murder. At trial, the forensic pathologist testified that it was his opinion that Duncan had not engaged in sexual activity for at least two

hours prior to her death. According to Hall, when Duncan was stabbed, her blouse was open, her brassiere was off, and she was otherwise naked. The forensic pathologist contradicted this, stating that his examination indicated that Duncan's clothing had been moved or removed after her death. Cuts in her brassiere matched stab wounds on her chest, and blood on the pants indicated she was probably wearing her pants when she was stabbed.

Hall also attempted to show that the murders were committed by someone else. Based on information obtained from Duncan's husband, who had investigated her murder on his own, Hall submitted testimony from various individuals that suggested Duncan may have been killed for selling "bad water" (bad PCP) to a man named Theadry Powell, who was also known as June or Junior.

At trial, Lee's notes were admitted as adoptive admissions over the defense counsel's objections for lack of foundation, hearsay, characterization of the notes as admissions, and relevance.[3] The prosecution's evidence connecting Hall to the crime consisted of his two oral statements, his written statement, and the notes obtained from Lee. There was no physical or forensic evidence connecting Hall to the murder, or to the area where Duncan's body was found.

Lee's notes were used by the prosecution in its closing argument to corroborate

Hall's confession, and the discrepancies contained in it. The prosecution did not call Lee. Post-trial proceedings revealed that the state chose not to call Lee to testify at the trial after he had told prosecutors they would be surprised by what he had to say. The jury convicted Hall on both counts, and he was sentenced to life in prison without the possibility of parole.

Subsequently, in a post-trial interview, Lee admitted to having deliberately fabricated the jailhouse notes by changing the questions after Hall had written his answers. Lee testified that the reason he lied was because the police threatened to kill him and his mother if he did not lie, and was promised a manslaughter conviction on his pending murder count.

In September 1994, Hall filed a habeas petition in the state trial court on the basis that his conviction was a result of false evidence presented to the jury. The trial court held an evidentiary hearing on the matter. Following the hearing, the trial court granted a writ of habeas corpus and ordered a new trial.

At the evidentiary hearing, Lee testified that when he wrote the questions in pencil, he applied very little pressure, and he positioned the questions to leave blank space where he could later write in new questions. Once he received the note back from Hall with an answer, he would erase the original question and write in a different question above Hall's answer that made the answer incriminating.[4] Hall and

---

3. In admitting the jailhouse notes, the court instructed the jury:

> Ladies and gentlemen, by way of explanation, these two documents, people's exhibits 13 and 14, both contained in this single sheet here are offered by the people on the theory that they represent questions asked by Mr. Cornelius Lee, written in all caps, and answers given by the defendant, Mr. Hall, written in not all caps, a total of two questions and two answers on each of the

two exhibits, a total of four questions and four answers.
> (Tr. Tran.4637.)

4. At an evidentiary hearing conducted on May 16, 1995, Lee testified that the first question originally asked: "Homeboy, do you think you're going to get any time on the case, the robbery case," to which Hall responded "possible." (Evidentiary Hr'g Tr. May 16, 1995 at 96.) Lee testified that in the second question he asked if Hall knew about something that

the prosecution both presented testimony from document review experts. Hall's expert identified three different types of alterations on the exhibits: erasures, disturbance of fiber, and overwriting.

In 1996, prior to the retrial, the California Court of Appeal, Second Appellate District, Division One, reversed the trial court, holding that Hall did not prove by a preponderance of the evidence that the notes were false. (*In re Hall,* No. B094232 (Cal.Ct.App. July 23, 1996)). Hall's petition for review in the California Supreme Court was denied. (*People v. Hall,* No. B094232 (Cal. Nov. 13, 1996)). Subsequently, Hall filed three state habeas petitions, two in the California Supreme Court and one in the California Court of Appeal. All three petitions were denied.

Hall filed a timely petition for a writ of habeas corpus in federal district court under 28 U.S.C. § 2254. He raised several constitutional issues including the use of false evidence to obtain his conviction, and the denial of his Sixth Amendment right to confront witnesses against him. The district court denied Hall's petition.

On April 10, 2002, Hall filed a Notice of Appeal. The district court construed the Notice of Appeal as a request for a Certificate of Appealability and granted the request on April 23, 2002.

## II.

### A. Due Process Concerns

Hall's basic claims [5] relate to the admission of, and use of the jailhouse notes,

subsequently proven to have been altered from their original state, as evidence in his trial. It is the use of these two exhibits as evidence at Hall's trial that presents serious concern. First, Hall claims that these exhibits constitute false and material evidence upon which his conviction was based, requiring a new trial.

In *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), Chief Justice Warren wrote for the Court, "First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, ... The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* (internal citations omitted).

Hall does not claim that the prosecution knew that the jailhouse notes were false at the time they were admitted into evidence; however, Hall does argue that to allow his conviction to stand, based on the present knowledge that the evidence was falsified, is a violation of his right to due process under the Fourteenth Amendment. *Id.*; *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Alcorta v. Texas,* 355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957).

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court reaffirmed its prior holdings that suppression of evidence favorable to the defense is a denial of due

---

Lee did with his girlfriend Glynnis, who Hall was acquainted with. (Evidentiary Hr'g Tr. May 16, 1995 at 101–03.) Hall replied, "Cause she was saying she did." Lee testified that in the original third question he asked Hall, "[D]id he go to a certain individual's barbecue or party, and I think he said 'yes,' he did, and everybody was there or something like that." (Evidentiary Hr'g Tr. May 16, 1995 at 97.)

**5.** Hall also claims: (1) he was denied the right to self-representation, in violation of the Sixth Amendment; (2) that his September 11, 1985, confession was coerced and involuntary; and (3) that he was denied his *Miranda* rights as to his first two statements. We have examined the record and find that these claims are without merit.

process, and a denial of due process occurs where the state allows false evidence to go uncorrected. *Id.* at 87, 83 S.Ct. 1194(citing *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Napue,* 360 U.S. at 269, 79 S.Ct. 1173). In addition, the Court held that suppression of "material" evidence by the prosecution results in a due process violation, regardless of whether there is good faith on the part of the prosecution. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . ." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoting *Napue,* 360 U.S. at 271, 79 S.Ct. 1173).

### B. Falsity

As the state habeas trial judge recognized, the threshold factual question is whether the notes were indeed false evidence. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant relief only if the state court adjudication:

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

*Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 364, 154 L.Ed.2d 263 (2002); *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d)(2).

■ A critical portion of the evidence presented to the state court was Lee's testimony. Lee testified that he "set up" Hall to provide allegedly self-inculpatory responses to his questions, for purposes of securing a better deal for himself in his own case. Specifically, Lee testified that he changed the questions after Hall wrote

his answers in order to make them appear incriminating to Hall. Lee testified that when he wrote the questions, he applied very light pressure.

The state habeas trial judge was understandably leery of Lee's story, and found him to be "plainly a liar," but also noted that "we have more than Mr. Lee coming into this case. We have scientific evidence that establishes that the letters, the correspondence between him and Mr. Hall includes some erasures." And indeed, the testimony of both handwriting experts provided support for Lee's testimony. Both experts testified that there had been erasures on the documents, and that they might have missed areas of erasure due to many environmental factors that affect the detection of alterations. The prosecution expert's opinion was consistent with Lee's testimony regarding his method for altering the documents. The expert stated that if soft lead was used and little pressure was applied, he would not be able to detect the erasure.[6]

Lee's testimony, as supported by the scientific evidence, led the state trial court to conclude that a new trial was necessary. On appeal, however, the California Court of Appeal apparently believed that the trial court did not make a finding that the notes were false, and thus did not accord the findings the "great weight" to which they are entitled. (*In re Hall,* No. B094232 at 9.) However, in granting a new trial, the trial judge implicitly acknowledged a finding of false evidence. At the outset, the trial judge identified the falsity of the notes as the crucial question:

> [W]e have a specific allegation of falsification of evidence. And it would seem to me that we should address that. If additional evidence is necessary to es-

---

**6.** The dissent makes much of the trial judge having thought Lee a liar. We suggest this *adds to* rather than detracts from that judge's conclusion that doubts about the accuracy and reliability of the jailhouse notes made a new trial necessary.

tablish materiality once that falseness has been shown in connection with your desire for a new trial, that might require additional evidence. But I'd like you to focus on what's at issue here, which is whether or not exhibits 13 and 14 were somehow falsely generated or fabricated in connection with this trial.

\* \* \*

The reason we have this hearing is because of a petition which I have just quoted from, which asserted that the Cornelius Lee notes, exhibit 13 and 14, were somehow tampered with or fabricated to create false evidence against Mr. Hall. If that's not proven, I think that moots—I mean that ends the hearing. If that is proven, then the next question is, should a new trial be ordered.

The trial judge expressly acknowledged the applicable standard of materiality, stating that in order to grant a new trial the false evidence would have to be found to be material to the jury's verdict:

I remember this case. It was an unusual case in many parts, and the evidence was in some parts quite strange and different. And I think that (defense) counsel makes an accurate point when he urges that these exhibits had to be material. There's no way that this Court can find them not to have been material. So it comes back to these two exhibits. This Court, I think, has to find that because the scientific evidence establishes that there were alterations at some point, and because Mr. Lee's testimony as to those alterations, for whatever value it may or may not have, was not presented to the trier of fact to assist it in evaluating these statements, and because these exhibits I think were material to the jury's decision, or more precisely because I certainly cannot de-

termine as a matter of law that they were not, I fear and I find that I have no legal or moral choice but to grant the petition for writ of habeas corpus and order a new trial for Harold Hall.

That the state habeas court granted Hall's petition, in light of the court's statements throughout the hearing regarding the requirement that Hall prove the existence of false evidence indicates an implicit and necessary finding by the trial judge that the exhibits had, indeed, been falsely altered. The judge acknowledged that this false evidence was a necessary precedent for the trial court to find materiality in order for the writ to be granted. Thus, in granting Hall's petition, the trial court implicitly, if not expressly, found the notes to be false evidence.[7]

The California Court of Appeal, therefore, proceeded from an incorrect premise, "agreeing" with the trial court that the notes were not false evidence, instead of acknowledging the trial court's implicit finding that they were. This was an unreasonable determination of the facts in light of the evidence that was presented at the state court evidentiary hearing. The state habeas trial judge necessarily found the notes to be false, and this finding was entitled to "great weight."

## C. Materiality

■ A new trial is not automatically required when false evidence is discovered. Rather, "[a] finding of materiality of the evidence is required under *Brady*, ... [a] new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury....'" *Giglio*, 405 U.S. at 154, 92 S.Ct. 763, (*quoting Napue*, 360 U.S. at 271, 79 S.Ct. 1173). "The question is not whether the defendant would more likely than not have received a different verdict

7. The judge also found that Lee's testimony was not credible *"except to the extent that it is* *supported by scientific evidence."* (emphasis added).

with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (reversing and remanding where evidence, undisclosed by the state, was found to be "material," meaning that it was favorable to the defendant, and the absence of this evidence at trial undermined confidence in the outcome of the trial).

■ In addressing Hall's claim of false evidence, the California Court of Appeal assumed without deciding that the notes were material, and thus there was no clear holding with respect to this claim. Later in the opinion, however, when addressing a similar claim which required a finding that the notes established a complete defense of innocence, the court stated that there was "overwhelming evidence of Hall's guilt" independent of the notes. To the extent this finding is entitled to AEDPA deference, it was also an unreasonable determination in light of the evidence presented at Hall's trial.

There was absolutely no physical or forensic evidence connecting Hall to the body or the alley in which it was found. The only other evidence of Hall's guilt was his curious and largely uncorroborated confession, which was shown to contain multiple inconsistencies and inaccuracies. For the most part, the confession did not match the evidence of the crime, and the descriptions of the position and location of the body were public knowledge. Once Hall's statements were shown to contain multiple discrepancies, the jailhouse notes took on added importance.

Recognizing this, in closing argument, the prosecutor urged the jury to rely on the notes as corroborating evidence of Hall's guilt. In responding to the defense attacks on Hall's confession, the prosecutor stated, "you have a handwritten note by the defendant, which the defense didn't try to explain, where he also admits liability." The prosecution used Lee's notes to corroborate Hall's confession, but the jury never had the opportunity to hear Lee testify and to assess his demeanor and veracity.

This is precisely why the state trial judge (who had presided over the original trial) concluded that the notes were material to the jury's decision. There is a reasonable likelihood that the introduction of the falsified notes affected the jury's verdict in this case. *Giglio*, 405 U.S. at 154, 92 S.Ct. 763. We have no confidence in the verdict under these circumstances. *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. In light of the already scant evidence on which the conviction was based, and the emphasis the notes thus took on at the original trial, it was unreasonable for the California Court of Appeal to conclude otherwise.[8]

8. We do not, as our colleague in dissent suggests, substitute our own judgment for that of the state court. Critical to our analysis is that the same judge who sat through the entire state trial, concluded that a new trial was necessary because of doubts about the credibility of the jailhouse notes and the absence of Lee as a witness. We are fully cognizant of the limited review power of the federal courts under AEDPA and the Supreme Court decisions of *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002), and *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002). For the reasons we have set forth in the majority opinion, we have concluded the state appellate court's judgment to be objectively unreasonable. This determination is not a mere synonym for clear error.

AEDPA, although emphasizing proper and due deference to the state court's findings, did not eliminate federal habeas review. Where there are real, credible doubts about the veracity of essential evidence and the person who created it, AEDPA does not require us to turn a blind eye. Was Lee lying when he

Because false and material evidence was admitted at Hall's trial in violation of his due process rights, we REVERSE the judgment of the district court with instructions that it should issue an unconditional writ of habeas corpus unless the state court grants Hall a new trial within 120 days of the issuance of this court's mandate.[9]

TALLMAN, Circuit Judge, dissenting.

Despite repeated admonishment by the United States Supreme Court of this court's habeas jurisprudence, once again my colleagues persist in ignoring the AEDPA standard of review in order to invalidate a reasonable state court determination of guilt in a 1985 murder case. One would think after reading the court's opinion that the record clearly established the following two facts:

- that the expert testimony regarding erasures on the notes at the state court collateral proceeding buttressed Lee's claim that he had changed *all* the questions on the notes after Hall provided answers, *see* Maj. Op. at 978, 979–980, 980, 982; and

- that Hall's confession to homicide detectives was so "suspect," *id.* at 978, "contradictory," *id.* at 979, "curious and largely uncorroborated," *id.* at 984, and full of "multiple inconsistencies and inaccuracies," *id.*, that it was of little or no probative value and should have been discredited by the jury.

testified at the preliminary hearing that the notes were authentic or when he later swore that they were altered to falsely incriminate Hall? To avoid a miscarriage of justice, the trial court concluded that a jury should make that determination in a new trial with Lee present as a witness and subject to cross-examination. Our opinion does nothing more or less than respect the judgment of the only

Conspicuous by its absence from the majority's view of the case is the evidence that:

- While the experts testified that some of the questions on the notes had been altered to a small extent (a letter here and there), the experts also testified that there were *no alterations* to some of the most incriminating portions of the questions and that *none* of the questions had been erased in their entirety, as Lee claimed; and

- Hall confessed that he forced the victim to orally copulate him, stabbed the victim twice on the right arm, knew the location and the position the body was left in, and knew that the victim suffered stab wounds on her chest, all of which was corroborated by physical evidence from the crime scene and autopsy results, and could only have been known by the victim's murderers.

Because these overlooked facts sufficiently corroborate Hall's confession of guilt and render the state appellate court determination objectively reasonable, I respectfully dissent.

I

We cannot grant habeas relief in this case unless the state court's determination was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir.2000), we found that the standards governing the

jurist who, by virtue of being present at Hall's trial, was in a unique position to understand the impact of the notes and Lee's absence.

9. Because of our decision that a new trial is necessary, we do not reach the question of whether the introduction of the jailhouse notes without Lee's testimony also violated the Confrontation Clause.

"unreasonable determination" clause of § 2254(d)(2) were equivalent to the standards governing the "unreasonable application" clause of § 2254(d)(1). At the time, our case law improperly instructed that an "unreasonable application" of Supreme Court precedent meant that the state court's application was clearly erroneous. *See Van Tran v. Lindsey,* 212 F.3d 1143, 1153–54 (9th Cir.2000).

That standard was subsequently corrected. Our "unreasonable application" formulation was not deferential enough to state courts under AEDPA. Instead, the Supreme Court told us that "unreasonable application" means more than just a "clear error," but instead means a decision that is "objectively unreasonable." *Lockyer v. Andrade,* —— U.S. ——, ——, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003). We are not to "conflat[e] error (even clear error) with unreasonableness," for the former "fails to give proper deference to state courts." *Id.*

Yet, the rule in *Torres* remains unblemished: the standards governing unreasonableness for § 2254(d)(2) are the same standards for unreasonableness under § 2254(d)(1). Thus, the "objectively unreasonable" standard reaffirmed by *Lockyer* for § 2254(d)(1) applies with equal force to the question presented today and governed by § 2254(d)(2).

Moreover, under AEDPA, state court factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Only if a petitioner presents "clear and convincing evidence" of an erroneous factual determination may we overrule a state court factual finding. *Id.*

## II

### A

The majority's description of the state court collateral proceeding implies that Lee, troubled by his conscience, finally came clean and testified truthfully at the state court collateral trial, and that his testimony was bolstered by scientific evidence affirming that he had erased all the incriminating questions. The record paints a different picture.

Lee testified at the preliminary hearing before Hall's criminal trial. Lee confirmed that he had written the questions on the notes to Hall while they were on "informant's row" in the Los Angeles County jail. Although the notes were admitted during the trial, the prosecution decided not to call Lee as a witnesss.

Then, at the state court collateral proceedings, Lee flipped. He there claimed that he had erased all the questions after Hall had answered them. Lee asserted that he had lied at the preliminary hearing because two homicide detectives threatened to kill his mother. He also insisted that at least two deputy district attorneys had instructed him to lie.

The hearing judge, understandably, found Lee to be less than credible:

> Cornelius Lee has testified in this case. If Cornelius Lee were to tell me what time it was, I would still want to look at the clock.
>
> I do not believe much of what he said. He is plainly a liar. I almost wanted to have the bailiff clean the witness stand after he left.

(E.R.244–45.) Only one conclusion can be reached from this credibility assessment: that nothing Lee testified to, whether at the preliminary hearing or at the collateral proceedings, should be believed without corroborating evidence.

The state court, therefore, was left with only the scientific evidence presented at the collateral hearing. The state's expert, Manuel Montilla, testified that:

> (1) he was "certain" that none of the questions on the notes had been totally erased;

(2) the erasures that took place were around phrases and letters, not total lines;

(3) no erasures were found in the phrase "Listing you are going to have to stop tell people that you killed that gril";

(4) the only erasures in the question "Okay when you guys put her in alley, who seen her" was the "y" and "u" in "you" and the "a" and "y" in "alley";

(5) the only erasures in the question "After you guys killed the gril, did you and V–Dog kill her brother two" were the "l" in "gril," the "g" in "V–Dog" and the "k" in "kill";

(6) the only erasures in the phrase "Hey, home boy the police want you and V–Dog" was the "g" in "V–Dog"; and

(7) the phrase "bad for killing" had some erasures.

Hall's expert, Kurt Kuhn, testified that:

(1) no erasures were conclusively found in the question "After you guys killed the gril, did you and V–Dog kill her brother two," and the only even possible erasure was the "l" in "gril";

(2) no erasures were found in the question "Did you killing that gril on 49th and Vermout, and why did you tell the ploice they know you did it"; and

(3) some "partial" erasures were found in the phrases "okay befor you guys killed" and "killed that gril, okay when you."

Faced with this testimony, the superior court judge concluded: "We have scientific evidence that establishes that the letters, the correspondence between [Lee] and [Hall] includes some erasures. What those erasures erased, what replaced those erasures, how extensive the erasure were are all subject to debate and possible evidentiary conflict." (E.R.245.) The judge

went on to find that because there were some alterations on the original note pages and because Lee never testified at trial, the state petition for a writ of habeas corpus should be granted.

The California State Court of Appeal reversed, finding that the notes were not false. The court explained that the lower court never expressly found that the notes were "false." The appellate court held that the scientific evidence established that the notes were not changed as substantially as Lee claimed. The court reasoned that the erasures that did take place are consistent with someone struggling with spelling, not someone erasing entire questions. *See In Re: Hall*, No. B09432 (Cal. Ct.App. July 23, 1996).

The majority takes issue with the state appellate court decision that the notes were not "false." The majority states that the "California Court of Appeal ... proceeded from an incorrect premise, 'agreeing' with the trial court that the notes were not false evidence, instead of acknowledging the trial court's implicit finding that they were." Maj. Op. at 13165. The majority is playing semantic games in order to gloss over the assumptions it makes that are unsupported by the record.

It is true that the trial court found the notes possibly erased *in part*. It is equally true that the trial court never, implicitly or explicitly, found that the notes were false *in total* as Lee testified. Indeed, doing so would have repudiated the expert testimony and credited Lee—something the trial court expressly refused to do: "The Court finds that[Lee's] testimony is *not credible except to the extent that it is supported by* scientific evidence." (Emphasis added). Based on the trial court's suspicion about the notes in part, it granted the petition. The only conclusion possible regarding falsity [1] from this record is

---

**1.** Another possible, and even likely, conclusion from the record is that the trial court simply misunderstood the standards govern-

ing state habeas relief for a conviction based on false evidence. Critical to the trial court was the fact that Lee never testified at trial:

to say that the trial court equated the partial alterations with complete falsity.

But the state appellate court accepted *the fact* that the notes were altered in part. What the appellate court reasonably took issue with is the implicit conclusion—if indeed there was one at all—that this rendered the notes "false." In other words, there was no "unreasonable determination of *the facts*" as the majority claims, but instead a conclusion about the significance of agreed-upon facts.

And this conclusion by the California Court of Appeal was objectively reasonable when one considers the standards that it must apply to state habeas proceedings. Under California law, Hall had the burden to prove that the notes were false by a preponderance of the evidence. *See In re Sassounian,* 9 Cal.4th 535, 37 Cal.Rptr.2d 446, 887 P.2d 527, 534 (1995). Based on this burden of proof, California courts reject claims of "falsity" when it is unclear whether evidence introduced at trial was completely false or not. *See, e.g., In re Roberts,* 29 Cal.4th 726, 128 Cal.Rptr.2d 762, 60 P.3d 165, 174 (2003) (refusing to label trial testimony that was later recanted as "false" because it was not clear whether the trial testimony, or the recantation, was actually the truth); *see also United States v. Croft,* 124 F.3d 1109, 1119 (9th Cir.1997) (holding that trial testimony is not "false" simply because it contradicts prior testimony).

But here, the trial court—if one accepts the majority's premise—found the evidence was false while also finding that Lee could not be believed and that the amount and significance of the erasures was in dispute. With these factual determinations established, the appellate court simply corrected the trial court's legal error and held that this evidence, under California law, did not meet Hall's burden to establish falsity in order to justify habeas relief.

This conclusion was not only reasonable, it was correct. The majority's holding today ignores the proper role the appellate court played in correcting the trial court's legal error. Even if one were to assume that the trial court did find that the notes were *completely* erased, based on the record the appellate court rightly stepped in and corrected the trial court's erroneous factual determination. To believe that the notes are completely false is to believe Cornelius Lee and disbelieve the scientific evidence, something the record will not allow. The scientific evidence merely shows minor erasures, and that none of the questions were erased in their entirety.

However one examines the California Court of Appeal's decision, it was well-within the contours of objective reasonableness. To conclude otherwise is to say that "unreasonable" really means "we disagree"—a proposition the Supreme Court

"So I grant this petition not because I think [Hall] is innocent ... but only because there is a player in the middle of all this, an obviously sleezy [sic] liar by the name of Cornelius Lee, and I think that the only way we can have justice here is for [Lee] and all of his sleeze [sic] to parade before a jury of our fellow citizens and let them decide what happened here.... Since this new information about material items of evidence that could well have affected the outcome of the trial, and since [Lee] was not called by either side as a witness at the [criminal] trial, the Court grants the Petition...." (E.R.246.)

But whether Lee would or would not testify, and whether that would serve justice in a new trial, has nothing to do with whether the notes that were admitted were false. Thus, contrary to the majority's reasoning, it is not necessary to infer that the trial court found the notes to be false. Instead, another perfectly reasonable inference is that the trial court simply erred as a matter of law in applying the standards for habeas relief and was subsequently corrected on review.

has expressly condemned. *See Lockyer*, — U.S. at ——, 123 S.Ct. at 1175.

## B

The majority, after quickly plowing through the "falsity" analysis, compounds its error in discussing materiality by substituting its judgment for the state appellate court, which is also impermissible.[2] The California Court of Appeal concluded:

> In any event, independent of the notes, there was overwhelming evidence of Hall's guilt. He confessed to the police that he forced Duncan to have intercourse, stabbed her twice in the arm, held her down while others stabbed her in the chest, and drove her body to the alley where it was discovered. He described the unique position in which Duncan's body was found. No more was required to support his conviction. . . .

*In Re: Hall*, at 11. The majority holds that this conclusion was unreasonable.

Instead of employing the majority's rhetorical strategy of characterizing Hall's confession with disparaging adjectives and generalities, I'll simply report what Hall confessed to.

Hall's signed confession states that Duncan was forced to orally copulate Hall. Lab tests showed that Duncan's mouth contained semen.

Hall confessed that he stabbed her twice in the right arm. Investigators noted Duncan had two stab wounds on her right wrist. Evidence adduced at trial indicates that one would not have been able to see Duncan's wrist unless they were standing directly over the body.

Hall confessed that he held Duncan down while she was stabbed in the chest by others. Investigators noted Duncan

suffered repeated stab wounds on her chest.

Hall confessed that Duncan's body was positioned on the ground in a unique position. His description exactly matched how the body was actually found.

Were there inconsistencies in Hall's version of events? Yes. But does that make Hall's confession worthless? Of course not, especially when one considers the precise details Hall knew that only someone who participated in the murder could have known. The majority's gross generalization that some of this information was "public knowledge" is simply incorrect and unsupported anywhere in the record. A bystander seeing Duncan's body from the street could not have determined that Duncan was raped or that she was stabbed twice on the wrist.

Were Hall's criminal case originally tried in federal court and before us now on direct review, the question of whether the notes—assuming they were false—were material might, in theory, be a close one. But was it *objectively unreasonable* for the California Court of Appeal to conclude that the notes were not material *when Hall confessed to the murder and physical evidence corroborated the confession?* To ask the question is to answer it.

## III

Too often, in violation of both the letter of AEDPA and the spirit of comity AEDPA embraces, this court strains mightily to grant a state court petitioner habeas corpus relief. *See, e.g., Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002); *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002).

---

**2.** The majority assumes that materiality is a question of fact governed by § 2254(d)(2). Whether properly examined under subpart (2) or subpart (1) of § 2254(d), the state court decision is objectively reasonable.

The decision we announce today is a continuation of that improper modus operandi.

Be it sound public policy or not, the people have spoken through Congress. Under AEDPA, Congress has severely circumscribed the power of federal courts to overturn state court convictions. Under these strict standards, we cannot substitute our judgment for the state court's judgment. Instead, in a case like this challenging state court factual findings, ours is a more passive and academic inquiry: is the state court determination objectively reasonable? This case, as the district court found, surely falls within the category of cases that meet this standard. The majority's conclusion to the contrary is nothing short of a return to the application of pre-AEDPA standards—at best. This is no longer the law. I respectfully dissent.

