# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BOBBY JOE MAXWELL,
              *Petitioner-Appellant,*

              v.

ERNIE ROE,

              *Respondent-Appellee.*

No. 06-56093

D.C. No.
CV-02-09555-
JVS(FMO)

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
December 7, 2009—Pasadena, California

Filed November 30, 2010

Before: Harry Pregerson and Richard A. Paez,
Circuit Judges, and James C. Mahan, District Judge.*

Opinion by Judge Paez

---

*The Honorable James C. Mahan, United States District Judge for the
District of Nevada, sitting by designation.

18949

## COUNSEL

Verna Wefald, Pasadena, California, for plaintiff-appellant Bobby Joe Maxwell.

Edmund G. Brown, Jr., Attorney General of the State of California, Dane R. Gillette, Chief Assistant Attorney General,

Pamela C. Hamanaka, Senior Assistant Attorney General, and Jaime L. Fuster, Deputy Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Los Angeles, California, for respondent-appellee Ernie Roe, Warden.

## OPINION

PAEZ, Circuit Judge:

Bobby Joe Maxwell was arrested in April 1979 and charged with murdering ten men in downtown Los Angeles, California. The media dubbed the murders for which Maxwell was charged the "Skid Row Stabber" killings. The prosecution's best physical evidence linking Maxwell to any of the crime scenes was a palm print on a public bench found near the body of one of the victims. The bench, however, was located in an area Maxwell frequented, and the prosecution was unable to isolate the age of the print. Lacking solid physical evidence, the prosecution rested its case on the testimony of jailhouse informant Sidney Storch. Storch testified that while he and Maxwell shared a cell, Maxwell confessed. Maxwell maintained that he was innocent and that Storch was lying throughout the nine month trial. The jury ultimately convicted Maxwell of two of the ten counts of first degree murder and one count of robbery. Maxwell was sentenced to life in prison without the possibility of parole. In exchange for his testimony at Maxwell's trial, Storch was released from custody one year and eight months early.

Maxwell appeals the district court's denial of his habeas petition. Maxwell's appeal and petition are governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). He raises two critical issues on appeal. First, he alleges that he was convicted on the basis of false material testimony by the prosecution's key informant witness, Sidney Storch, in violation of his due process rights. Second, he contends that

the prosecution withheld material information concerning the deal that Storch received in exchange for his testimony and Storch's prior informant history in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[1] Pursuant to 28 U.S.C. § 1291, we have jurisdiction over this timely appeal. We reverse in part and affirm in part.

## I.   Factual Background

David Martin Jones was fatally stabbed on November 9, 1978, as he bedded down at night at the Los Angeles downtown public library. Shortly before Jones was stabbed, a man approached three homeless men, all friends of Jones's, who were also spending the night outside the library. The prosecution contended that this man was Jones's killer. The three homeless men would later testify that the alleged killer was a large black man, who said in a soft, low voice that his name was Luther and he was from Puerto Rico. One witness said he had a Spanish or Carribean accent and another said he did not. One of the witnesses, Thomas Jones, later testified that he looked at the killer's face in the darkness for about half a minute, and all three described the killer's gait as unusual and slow. After speaking with the three witnesses, the man walked away from the three homeless men toward where Jones lay. Shortly thereafter Jones shouted that he had been stabbed. The three men ran to Jones, who was gasping and blood soaked. When Thomas Jones asked Jones who stabbed him, Jones replied, "The guy that just left."

---

[1]Maxwell also claims: (1) that the trial court violated his confrontation clause and due process rights by admitting the preliminary hearing testimony of deceased witness Thomas Jones and excluding voiceprint analysis evidence relevant to Jones's testimony; and (2) that the trial court violated his due process rights by excluding third-party culpability evidence suggesting that Gary Stinson committed the murders. We have examined Maxwell's arguments and the record, and we conclude that the state appellate court neither made an unreasonable determination of the facts nor misapplied clearly established federal law in rejecting Maxwell's challenges to these evidentiary rulings. We, therefore, affirm the district court's rulings on these issues.

Frank Garcia's body was discovered on a park bench at the Los Angeles City Hall Mall on Thanksgiving morning, November 28, 1978. His empty wallet lay beside his body on the park bench. Garcia had been stabbed 20 times. Roughly three months later, in early January 1979, graffiti was found on a restroom wall of the Greyhound Bus Station which said: "My name is Luther, I kill wino's to put them out of their misery."

In April 1979, Maxwell was arrested. A knife consistent in size with Jones's stab wound and Garcia's stab wounds was found on Maxwell's person as was a Bic cigarette lighter. Police seized a sweatshirt, a cap, tennis shoes, and a log book from Maxwell's sister's home. On the log book Maxwell had written "Satan, praise be unto you."

At a lineup where Maxwell was instructed to say "my name is Luther," none of the three homeless men who saw Jones's alleged murderer identified Maxwell. In fact, one witness said, "you've got everyone up there that doesn't look like him." At the preliminary hearing six months later, however, Thomas Jones heard Maxwell speak in court, and at that time he identified Maxwell's voice as that of the killer.[2] One of the other witnesses, upon seeing Maxwell at the preliminary hearing, wrote the prosecutor a letter in which he said, "I sure hope you have the right guy, because if you do, he sure did change a lot in the last six months." As for the knife, Maxwell's sister testified that Maxwell frequently carried a knife, and a friend of Maxwell's testified that he once saw Maxwell with a knife but that "generally, people in that neighborhood always carry knives."

Muddy shoeprints were found near Garcia's body, and the prosecution's expert concluded that the prints were consistent with a pair of Maxwell's shoes and with measurements made of his stride. A defense expert examined the muddy shoeprints

_____

[2]Thomas Jones died before Maxwell's trial began.

and concluded that the prints were too indistinct to show anything and it was impossible to make a gait comparison without knowing the speed of the person who left the prints. Garcia's wife testified that the Bic lighter looked like one Garcia had, but she was not shown the lighter in a lineup. Garcia's stepson was unable to identify the lighter in a lineup of similar lighters, and two police detectives said there was nothing unusual about the lighter to distinguish it from any other Bic lighter. Blood samples and cigarette butts from the Jones crime scene could not be linked to Maxwell.

## II.   Procedural History

Maxwell's trial began in January 1984 and lasted nine months. At trial, Storch testified that he shared a cell with Maxwell in 1983 for about three weeks.[3] According to Storch, one day while sitting together in their cell, Maxwell read a newspaper article about the Skid Row Stabber case, which mentioned that a palm print had been found on a public bench near one of the crime scenes. Upon reading this article, Storch testified, Maxwell confessed that he had made a "mistake" by not wearing gloves. Specifically, Storch testified on direct examination:

> Earlier in the evening there was a newspaper article that had [Maxwell's] name in it that was passed down from another cell. . . . [Maxwell] pointed to

---

[3]Maxwell disputes this testimony. Maxwell alleges that the two shared a cell on November 30, 1983, for four hours, not three weeks, and that the jail housing records confirm his account of events. Although the housing records could be construed to support Maxwell's account of events, because the state submitted evidence that those records were unreliably kept in 1983 and suffered from frequent technical glitches, we cannot say that the superior court made an unreasonable determination of the facts when it found the housing records were inconclusive. *See Wood v. Allen*, 130 S.Ct. 841, 848 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

one particular description in the article . . . he told me that in this particular instance that the police had said they found a palmprint of his in an area near one of the people he was accused of having harmed. He felt that he wasn't prone to that kind of mistake[ ], that he didn't make that kind of mistake because he wore gloves with the fingers cut off so as to keep his hands warm and leave his fingers free. . . .

The prosecution argued during closing arguments that Storch's testimony proved that Maxwell had admitted responsibility for each of the ten murders and that he was the Skid Row Stabber.

After the lengthy trial, the jury returned a verdict of guilty on two counts of murder and one count of robbery. Maxwell was found not guilty on three counts of murder and the jury was unable to reach a verdict on five counts of murder and three counts of robbery. The jury also found true two special circumstance allegations, namely multiple murder and murder committed while engaged in a robbery of the victim. The trial court sentenced Maxwell to life imprisonment without the possibility of parole on both counts of conviction with the sentences to run concurrently.

Maxwell appealed his convictions and sentence to the California Court of Appeal. In March 1991, the California Court of Appeal affirmed the trial court's judgment in full and shortly thereafter denied Maxwell's petition for rehearing. Maxwell then filed a petition for review with the California Supreme Court, which the court denied in June 1991.

In October 1991, Maxwell filed a habeas corpus petition in Los Angeles Superior Court, which was subsequently denied in August 1993. In October 1995, Maxwell filed a habeas corpus petition in the California Supreme Court. In May 1996, the California Supreme Court issued an order to show cause, returnable to the Los Angeles County Superior Court, on the

issue of whether Maxwell was entitled to relief based on the allegation that jailhouse informant Sidney Storch gave false testimony at trial.

The Los Angeles County Superior Court held an evidentiary hearing on the question of whether Storch gave false testimony. That hearing extended over two years, from August 1997 to November 1999. In February 2000, the Superior Court issued a 34-page written ruling in which it concluded that while Storch might have proceeded to become an established liar and sophisticated jailhouse informant, Storch had not lied at Maxwell's trial.

On April 20, 2001, Maxwell filed a second habeas corpus petition in the California Supreme Court, which the court denied on December 19, 2001. One Justice dissented from denial, writing that she was "of the opinion an order to show cause should issue."

On December 16, 2002, Maxwell filed a petition for writ of habeas corpus in federal district court. The district court concluded that Maxwell's delay in filing his second habeas petition in the California Supreme Court was reasonable. The court, therefore, concluded that AEDPA's one-year statute of limitations was tolled and Maxwell's petition was timely. Addressing the merits, the district court concluded that the state court had not violated Maxwell's confrontation clause and due process rights by admitting the preliminary hearing testimony of deceased witness Thomas Jones and by excluding other evidence relevant to Thomas Jones's testimony; that the state court did not violate Maxwell's due process rights by excluding third-party culpability evidence; and that Maxwell's due process rights were not violated by the prosecution's knowing use of perjured testimony from Storch and other jailhouse informants. With respect to Storch, the district court concluded that the state court's finding that the housing records were ambiguous was not objectively unreasonable; that Storch's lies about the deal he received from the prosecu-

tion and about his informant history did not prejudice Maxwell; and that the prosecution did not violate *Brady* because any withheld information was neither material nor prejudicial. Accordingly, judgment denying the petition with prejudice was entered in May 2006. Maxwell timely appealed.

## III.   Standard of Review

We review de novo the district court's denial of a state prisoner's habeas petition. *Parle v. Runnels*, 505 F.3d 922, 926 (9th Cir. 2007). Maxwell's petition is governed by AEDPA. Under AEDPA, a state prisoner is entitled to relief if the state court adjudication of a claim resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). "Clearly established" federal law for purposes of AEDPA § 2254(d)(1) consists only of Supreme Court holdings; however, circuit court precedent may be "persuasive" in demonstrating what law is "clearly established" and whether a state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). As we explain below, when a state court adjudication is based on an antecedent unreasonable determination of fact, we proceed to consider the petitioner's related claim de novo. *Detrich v. Ryan*, 619 F.3d 1038, 1059-1060 (9th Cir. 2010).

We review the state court's last reasoned decision. *Barker v. Fleming,* 423 F.3d 1085, 1091-92 (9th Cir. 2005) (citing *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991)). Here, the California Supreme Court denied direct review and denied the habeas petition Maxwell filed after the evidentiary hearing. In other words, the California Supreme Court never issued a reasoned decision on any of Maxwell's federal constitutional claims. Therefore, we review the Superior Court's reasoned order that follows completion of the evidentiary hearing in

considering Maxwell's due process claim and the California Court of Appeal's opinion with respect to most other claims. *See Ylst*, 501 U.S. at 803. No California court has offered a reasoned decision for denial of Maxwell's *Brady* claim; the California Supreme Court summarily denied it. In such a situation, we review the factual record de novo to determine whether the California Supreme Court's summary denial of the claim constituted an unreasonable application of *Brady*. *See Greene v. Lampart*, 288 F.3d 1081, 1088-89 (9th Cir. 2002).

## IV.    Timeliness

The state challenges Maxwell's habeas petition as untimely. Under AEDPA, a state prisoner has one year from the date when his conviction becomes final to file a habeas corpus petition. 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled while "a properly filed application for State post-conviction or other collateral review . . . is pending." *Id.* § 2244(d)(2). In the usual case, an application for state post-conviction review remains "pending" after a lower court denies a prisoner's petition for state post-conviction review and the prisoner files a notice of appeal, provided that the filing of the notice of appeal is timely under state law. *See Carey v. Saffold*, 536 U.S. 214, 219 (2002); *see also Banjo v. Ayers*, 614 F.3d 964, 968-969 (9th Cir. 2010).

California's system of habeas review, however, is unusual in that there is no way for a prisoner seeking post-conviction relief to formally appeal a lower court's decision. *See Carey*, 536 U.S. at 221. Instead, each level of the California court system has original jurisdiction over habeas petitions, and a petitioner, like Maxwell, faced with an unfavorable result in a lower court must file an original petition with the higher state court. *See* Cal. Const., art. VI, § 10 ("The Supreme Court, courts of appeal, superior courts, and their judges have original jurisdiction in habeas corpus proceedings."); *see also Carey*, 536 U.S. at 224 (explaining that in California "the

only avenue for a prisoner to challenge the denial of his application in the superior court is to file a 'new petition' in the appellate court").

The United States Supreme Court has determined that California's "special system governing appeals" of habeas petitions is "sufficiently analogous to appellate review systems in other States" that AEDPA's statute of limitations is tolled during the time between the unfavorable decision on an original petition in a lower court and the filing of a subsequent petition. *See Evans v. Chavis*, 546 U.S. 189, 192-93 (2006). This is commonly referred to as "gap tolling" or "interval tolling." *See Gaston v. Palmer*, 417 F.3d 1030, 1041 (9th Cir. 2005) (citing *Carey*, 536 U.S. at 223); *Chaffer v. Prosper*, 592 F.3d 1046, 1048 (9th Cir. 2010) (per curiam). AEDPA's statute of limitations will be tolled, however, only if the prisoner timely filed his subsequent petition in a higher state court.

**[1]** Under California law, a habeas petition is timely if it is filed within a "reasonable time." *Evans,* 546 U.S. at 198; *see also Waldrip v. Hall*, 548 F.3d 729, 734 (9th Cir. 2008). California has not, however, provided guidance as to what constitutes a "reasonable time." *Evans*, 546 U.S. at 198. The State argues here that Maxwell's delay from the time that the Superior Court denied his petition, February 10, 2000, until the date he next filed a petition with the California Supreme Court, April 20, 2001, was not reasonable and, therefore, AEDPA's limitations period should not be tolled.

A federal habeas court must determine timeliness when there is no clear indication by the state court. *Id*. Accordingly, the district court considered the question and determined that Maxwell's delay in filing his petition with the California Supreme Court was "reasonable" under California law and, therefore, timely. We agree.

First, we note that it appears that the California Supreme Court considered the petition on the merits, which at least

suggests it considered the petition timely. Although the California Supreme Court denied Maxwell's petition, one justice dissented from the denial of rehearing and stated that she was "of the opinion an order to show cause should issue." The California Supreme Court also did not cite to any case law in support of the dismissal of the petition, as it often does when rejecting an untimely petition. *See, e.g., Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) (explaining that in that case the California Supreme Court denied the petitioner's claims as untimely and cited to *In re Clark*, 855 P.2d 729 (Cal. 1993) and *In re Robbins*, 959 P.2d 311 (Cal. 1998)). Although this is not a dispositive statement of consideration on the merits, and consideration on the merits does not "decide the question" of whether the petition was timely, it is a factor we consider. *See Carey*, 546 U.S. at 194 (explaining that we may consider whether the California Supreme Court considered a matter on the merits, but not take such consideration as "an absolute bellwether" on the timeliness question).

Second, Maxwell has offered a compelling justification for his delay in filing his second state petition. Under California law, a petitioner must provide an explanation for any significant delay in applying for habeas relief. *In re Clark*, 959 P.2d at 738; *see also Evans*, 546 U.S. at 201 (holding that petitioner's "unexplained, hence unjustified, delay of at least six months" was not reasonable for purposes of California law); *Chaffer*, 592 F.3d at 1048 (denying a petition that included a 115-day gap between the filing of the first two habeas petitions and 101-day gap between the second and third habeas petitions in the California Supreme Court where the petitioner "offered no justification for the delays as required under California law").

**[2]** Here, Maxwell had good reason for his delay in filing. This was an unusual case. The original charge was for ten counts of capital murder, and the case moved at an uncommonly slow pace due to its sheer magnitude. Maxwell was arrested on April 4, 1979, but his trial did not begin until four

years later in January 1984. Maxwell's jury trial lasted nine
months. Maxwell's direct appeal took another seven years. On
direct appeal, the combined Reporter's and Clerk's Tran-
script, including arguments, filled nearly 20,000 pages. Fol-
lowing his direct appeal, Maxwell filed a habeas corpus
petition in the superior court. That petition was accompanied
by 179 exhibits comprising more than 1700 pages in eight
volumes. That court issued an order to show cause, but denied
the petition without holding an evidentiary hearing. Thereaf-
ter, Maxwell filed a new habeas corpus petition in the Califor-
nia Supreme Court. It was not until twelve years after the jury
returned its guilty verdict that the California Supreme Court
on post-conviction review issued an order to show cause on
the issue of whether jailhouse informant Sidney Storch gave
false testimony. A year after that, the evidentiary hearing
regarding Storch began. The evidentiary hearing spanned over
two years and during that time numerous pleadings were filed,
more than thirty witnesses testified, and over fifty exhibits
were admitted. The record from the two-year hearing filled
ten volumes and thousands of pages. In short, the evidentiary
hearing in this case was astoundingly long, the record com-
plex and voluminous, and Maxwell's claims were substan-
tially affected by the Storch evidence that was discovered
during the course of the hearing.

Furthermore, as Maxwell's counsel explained to the district
court, the California Supreme Court petition raised two claims
directly related to the original claims concerning the use of
jailhouse informants, and these claims required her to conduct
significant legal research and to rewrite the petition to incor-
porate evidence that had come to light during the evidentiary
hearing. In particular, because Maxwell challenged the state
court's factual finding and did so on the basis of evidence
presented over a two-year span, defense counsel—who was
representing Maxwell pro bono at the time[4]—had to review

---

[4]Maxwell was no longer entitled to a court-appointed attorney at this
stage of the litigation.

all the new evidence in order to make the case that the Superior Court had erred in rejecting Maxwell's claim based on Storch's testimony. Aside from conducting new research and incorporating the new evidence into the habeas petition, defense counsel explained to the district court that she spent time determining which of the exhibits and "dozens and dozens of pleadings" should be submitted to the state supreme court in support of the petition. The magnitude of the task is apparent in Maxwell's petition to the California Supreme Court: the petition spans over 160 pages and cites to the evidentiary hearing record, the reporter's transcript, and exhibits from the evidentiary hearing over 500 times.

[3] We have carefully considered Maxwell's arguments, and we agree with the district court that based on the need to review the voluminous record, to conduct legal research of complex claims, to address the Superior Court's lengthy decision, to incorporate the findings of the two-year evidentiary hearing, and to redraft the original habeas corpus petition, Maxwell's delay was reasonable in this case. Furthermore, one justice of the California Supreme Court dissented from the denial of Maxwell's petition. For all these reasons, and based on the particular circumstances in this case, we agree with the district court that Maxwell's delay in filing his habeas petition with the California Supreme Court was reasonable and, therefore, that AEDPA's statute of limitations was tolled during the time between the Superior Court's decision and his second petition to the California Supreme Court. Maxwell's federal habeas petition was therefore timely.

## V.   Discussion

### A.   Background

Maxwell's conviction was based in large measure on the testimony of the jailhouse informant Sidney Storch. To put this case in context, we begin with a brief discussion of Storch and the use of jailhouse informants in Los Angeles County in

the 1980s. The facts about Storch are recounted from the state court's evidentiary hearing.

### 1.   Sidney Storch

Sidney Storch had a long and public history of dishonesty, starting with his discharge from the U.S. Army in 1964 for being "a habitual liar." By the time of Maxwell's 1984 trial, Storch was 37 years old and a reported long-time heroin addict. He was a criminal recidivist, with four felonies and approximately 13 arrests under his belt. His crime of choice was forgery, and he was well-known with the Los Angeles Police Department ("LAPD") forgery division from both a defense and prosecution standpoint. In 1981 and 1982, Storch supplied information to the LAPD about forgery rings. Subsequently, in 1983, Storch was arrested by the Los Angeles Police Department for, among other crimes, impersonating a Central Intelligence Agency ("CIA") officer and Howard Johnson, the son of the well-known Howard Johnson hotel chain. At the time he was apprehended and placed in a cell with Maxwell, Storch was in possession of a false California driver's license, forged checks, and stolen credit cards. The detective who arrested Storch characterized him as a "sophisticated forger" and testified that he "would not trust anything Sidney Storch said unless you could corroborate the information with some source."

Following Storch's 1983 arrest, Storch's public defender negotiated a guilty plea deal whereby Storch's five pending cases would be consolidated for sentencing and the court would impose a total combined sentence of 36 months in prison. Storch, however, independently negotiated a sixteen-month prison term, almost two years less than the deal his public defender had been able to secure for him. In exchange for his reduced prison term, Storch agreed to testify for the prosecution at Maxwell's trial.

Storch testified at Maxwell's trial in 1984. Thereafter, Storch testified for the Los Angeles County District Attorney's Office in no less than six cases, several of them high-profile.[5] By 1985 or 1986, Storch was classified as an informant or "K-9" and was housed in the K-9 module, otherwise known as "informant's row." *See Hall v. Dir. of Corrs.*, 343 F.3d 976, 978 (9th Cir. 2003) (per curiam) (explaining that the jailhouse informant who fabricated material evidence in that case was housed on "informant's row"). By 1988, however, Storch's informant days were over. Storch was caught fabricating lies as he testified for the prosecution in the unrelated case *People v. Sheldon Sanders*, No. A039120 (L.A. Super. Ct. April 25, 1988); as a result, he was marked by the Los Angeles County District Attorney's office as unreliable and unusable and was later indicted for perjury.[6]

---

[5]One 1989 Los Angeles Times article reported:

> According to Storch's testimony and statements to police, defendants who made incriminating statements to him include: Bobby Joe Maxwell, convicted in 1984 of two of the "Skid Row Stabber" killings; Tracey Carter, accused of the 1987 robbery and murder of a minister who had stopped to use a pay telephone in South-Central Los Angeles, and Stewart Woodman, charged with engineering the "Ninja"-style killing of Woodman's parents in the garage of their fashionable Brentwood condominium. Said inmate Daniel Roach: "It seems that half the world just confesses to Sidney Storch."

Ted Rohrlich & Robert W. Stewart, *Jailhouse Snitches: Trading Lies for Freedom*, L.A. Times, Apr. 16, 1989, at 1.

[6]The audacious perjury of jailhouse informants like Storch motivated a Los Angeles County grand jury investigation into the involvement of jailhouse informants in the criminal justice system in Los Angeles County. As reported to the grand jury, Leslie Vernon White, a jailed informant, demonstrated for the Los Angeles County Sheriff's Department in 1988 the ease with which he and others were able to obtain confidential information and then fabricate confessions of fellow prisoners. Report of the 1989-90 Los Angeles County Grand Jury (hereinafter "Grand Jury Report"), June 26, 1990, at 16. Following Leslie Vernon White's confirmation of the ease with which informants could fabricate confessions, the California Attorney General appointed a special counsel and began what was then the

## B. Due Process Concerns

Maxwell argues that his due process rights under the Fourteenth Amendment were violated when he was convicted on the false material testimony of jailhouse informant Sidney Storch. In particular, Maxwell alleges that the Superior Court's factual determination that Storch testified credibly at Maxwell's trial was an unreasonable determination of the facts and that admission of Storch's false testimony prejudiced his case.

[4] In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court explained that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncor-

most comprehensive inquiry into the use of jailhouse informants in Los Angeles. *See* Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1394 (1996) (explaining that as a result of Leslie Vernon White's demonstration, "[d]efense lawyers have compiled a list of 225 people convicted of murder and other felonies, some sentenced to death, in cases in which Mr. White and other jailhouse informers testified over the last 10 years in Los Angeles County" (citation omitted)). During the course of the grand jury investigation, over one hundred and twenty witnesses, including six self-professed jailhouse informants, testified; Sidney Storch was one of the six informants who testified. *See United States v. Bernal-Obeso*, 989 F.2d 331, 334 (9th Cir. 1993) (quoting the Grand Jury Report and explaining that "[c]riminals caught in our system understand they can mitigate their own problems with the law by becoming a witness against someone else").

After testifying before the grand jury, Storch was listed on the 1988 grand jury's investigating informant abuse list and he was among the individuals that the grand jury recommended that the District Attorney consider prosecuting for informant abuses. As a result, Storch was the first informant to be indicted for perjury following the 1988 grand jury investigation. Storch, however, never confronted those charges because he died in a New York jail before he could be extradited to California.

rected when it appears." *See also United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair"). We have also concluded that a defendant's due process rights were violated, and accordingly granted habeas relief, when it was revealed that false evidence brought about a defendant's conviction. *See, e.g., Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002); *Hall*, 343 F.3d at 978.

A new trial is not automatically required when false evidence is discovered. Rather, a constitutional error resulting from the use of false evidence by the government requires a new trial, "if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271). We first consider whether the Superior Court's finding that Storch testified truthfully at Maxwell's trial was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2). Concluding that it was, we proceed to consider whether Storch's false testimony was material. Because we conclude that the false testimony was material and its inclusion undermines confidence in the judgment of the jury, we reverse the district court's judgment on this claim. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

### 1.  Falsity

The State maintains that the Los Angeles County Superior Court's conclusion, following the hearing conducted on Maxwell's state habeas petition, that Storch gave truthful testimony at Maxwell's trial was an objectively reasonable determination of the facts. We disagree.

Our review of a state court's factual determination is controlled by 28 U.S.C. § 2254(d)(2).[7]  AEDPA § 2254(d)(2)

---

[7]We apply § 2254(d)(2) to situations, such as that here, where a "petitioner challenges the state court's findings based entirely on the state

authorizes federal habeas relief in those cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003).

Where a petitioner challenges the state court's findings based entirely on the state record, "we must be particularly deferential to our state-court colleagues," and defer to their factual findings unless we are "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor*, 366 F.3d at 999-1000. "This is a daunting standard—one that will be satisfied in relatively few cases." *Id*. However, "the standard is not impossible to meet." *Id*. After careful consideration of the evidence before the state court, including that which came to light during the evidentiary hearing, we conclude that Maxwell has met that standard here.

In May 1996, the California Supreme Court issued an order to show cause on the single issue of whether Sidney Storch gave false testimony at Maxwell's trial, transferring the matter to the Superior Court. The Superior Court conducted an evidentiary hearing spanning two years to resolve the question. More than thirty witnesses testified and fifty exhibits were entered into evidence. In February 2000, the Superior Court denied relief in a 34-page written opinion. The court acknowledged that Maxwell had established that by 1988 Storch was untrustworthy and a sophisticated "booker" of defendants or a "jailhouse snitch." The Superior Court, how-

---

record." *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004). By contrast, we do not apply 28 U.S.C. § 2254(e)(1), which applies to challenges based on extrinsic evidence or "evidence presented for the first time in federal court," and requires proof by clear and convincing evidence. *Id*. at 1000.

ever, concluded that "whatever sophistication Storch possessed at these later times, he developed after his testimony against petitioner," when he was just a "neophyte jailhouse informant." The finding that Storch became a sophisticated "booker" of prisoners only after Maxwell's trial, given the evidence that was presented at trial and at the evidentiary hearing, was arbitrary, and for the reasons set forth below, we conclude that it was objectively unreasonable to find that Storch testified truthfully.

First, it is undisputed that Storch told numerous lies at Maxwell's trial. At a minimum, Storch lied about his motivation for coming forward, his prior record, the amount of money he had stolen, the level of education he attained, and the fact that he had previously worked out a 36-month prison term in exchange for his guilty plea before the sixteen-month deal he ultimately received in exchange for his cooperation and testimony in Maxwell's trial. Specifically, Storch testified at Maxwell's trial that he was not seeking leniency in exchange for his testimony. Rather, Storch stated, he had sought guidance from the prison rabbi about whether to testify and had concluded thereafter that he should. This was a lie. The prison rabbi testified that Storch had never discussed Maxwell's case with him nor sought his guidance. Storch testified that there were no deals between him and the prosecution prior to the sixteen-month deal he received. This was a lie. Storch's public defender had previously worked out a 36-month deal. Storch testified that he had only two prior felony convictions when in fact he had more. Storch stated that his five pending cases involved "almost $13,000" of forged funds, but the amount was closer to $44,000. Finally, Storch said he had completed two and a half years of college in business administration when, in truth, he had never gone to college.

The fact that Storch told several lies under oath contemporaneous with his testimony regarding Maxwell's alleged confession does not alone establish that Storch lied about the

confession itself. Storch's perjury, however, indicates a willingness to lie under oath and lends credence to Maxwell's arguments that Storch lied when he testified about the alleged confession and that the prosecution knew or should have known that Storch gave false testimony.

Storch also misrepresented his sophistication and experience as a jailhouse informant at Maxwell's trial. In particular, Storch testified at trial that he had never testified for the district attorney's office before. Maxwell, however, submitted evidence at the Superior Court hearing that contradicted this characterization of Storch as new to the informant world and new to cooperating with the district attorney's office.

For example, Gregory Schwien—a detective with the LAPD Bunco Forgery division—testified that in the early 1980s, Storch "supplied information to us [the police] regarding forgery rings . . . ." Schwien recounted an incident from 1981 or 1982 where Storch wanted to entrap someone, "more or less set that individual up," by planting bad checks on him. After that, despite having worked with Storch for about a year, Schwien testified at the evidentiary hearing that he "stopped all contact with [Storch]" because he found Storch to be unreliable. Patrick Riley, who worked for the LAPD for 23 years, testified that Storch worked as an informant for him around 1983, a year before Maxwell's trial. Riley testified at the evidentiary hearing that Storch "was a person that committed forgery on an ongoing basis," a heroin addict, and an informant. Gary Ingemunson, who worked in the LAPD forgery division, testified that he interviewed Storch in 1983 while Storch was in custody. Ingemunson testified that Storch was "acting as an informant," "giving me information," and "providing information about other criminals in the Los Angeles area in the forgery field." Storch's informant activities with Schwein, Riley, and Ingemunson all predated Maxwell's trial. Finally, Samuel George Porter, a sergeant in the Sheriff's Department in the inmate reception center, testified

that when he came into contact with Storch in 1985 or 1986, Storch was officially classified as an informant or "K-9."

The testimony of Schwien, Ingemunson, and Riley established that Storch misrepresented his informant past at trial and that Storch did indeed have a history of working as an informant and "booking" other criminals. It is undisputed that in at least one such instance, Storch went so far as to suggest that fake checks be planted on an individual in order to "book" him. This testimony directly contradicts the district court's characterization of Storch as a "neophyte" informant in 1984. Finally, Porter's testimony that Storch was officially classified as a "K-9" by 1985 or 1986, a classification reserved for seasoned official informants, reasonably suggests that by 1984 Storch was well on his way to becoming, if not already, a professional informant.

Storch not only had an established history of working as an informant by the time of Maxwell's trial, but he also had a signature modus operandi for "booking" fellow inmates. That method—for which Storch became famous—was precisely the one that Maxwell alleges Storch employed in this case. Storch's method to "book" an inmate was to gain physical proximity to a high-profile defendant, get information about the case from the media, usually a newspaper, and then call the District Attorney or law enforcement and offer to testify. Several examples of Storch's use of this "booking" method came to light during the evidentiary hearing. Sergeant Porter testified that Storch once requested that a high-profile defendant, who had been in the news, be transferred to his row. Porter testified that he did not move the defendant because he believed that Storch planned to use a newspaper article to fabricate testimony against him.[8] According to Porter, his suspi-

---

[8]Porter's testimony that he could freely transfer inmates among cells was corroborated by the testimony of Phillip Sowers and William Patterson. Sowers was an investigator for the City of Los Angeles from 1971-92. He testified that detectives could easily get inmates moved within the jail. Similarly, Patterson, a former Los Angeles County Sheriff's Department employee, testified that in late 1982 and early 1983, he was able to move inmates in order to use them as informants.

cion was based on knowing Storch for five years and concluding that he "was not credible."

John Kryniak, a former Pasadena police officer and Los Angeles District Attorney, testified that in 1986 Storch came forward and offered to testify for the government in the high-profile "Ninja murders" case. Kryniak explained that he decided not to use Storch when he learned that Storch had been placed in the defendant's cell *after* the time Storch claimed he was there. Kryniak further testified that he chose not to use Storch's testimony because he did not believe Storch was telling the truth and because Storch had a very checkered history as an informant.

Joseph Markus testified that he was assigned to prosecute a high-profile case in 1988. Storch testified at the preliminary hearing for that case. Markus testified that he found Storch's testimony suspiciously similar to newspaper stories about the case, and thus concluded that, "as a result of the similarities between his testimony and these newspaper stories, I felt that Storch could make up the information and did not believe his testimony." Markus also testified that he found Storch to be very manipulative and was surprised by his frequent access to the jailhouse phone.

According to evidence gleaned during the state court evidentiary hearing, Storch lied under oath about more than fellow inmates' confessions. In April 1985, Storch testified for the prosecution in *People v. Stephen Naquin*, No. A809434 (L.A. Super. Ct. Oct. 7, 1985). At that trial, a mere nine months after Maxwell's trial, Storch lied about the benefit he received for testifying in Maxwell's trial and about his motivations for testifying in the *Naquin* trial itself, among other fabrications. In November 1985, Storch falsely testified for the prosecution in another case, *People v. Carl Jones*, No. A809938 (L.A. Super. Ct. Nov. 18, 1985). In that case, Storch falsely testified that he did not expect any benefit for his testi-

mony and that he had no charges pending against him, among other lies.

In April 1988, at the trial of *People v. Sheldon Sanders*, No. A039120 (L.A. Super. Ct. Apr. 25, 1988), Storch lied while under oath when he denied getting a deal in exchange for his testimony in Maxwell's trial. This lie ultimately resulted in Storch's indictment for perjury. In seeking the indictment, the Deputy Attorney General told the grand jury that:

> First of all, Mr. Storch . . . was a People's witness in *People v. Sanders*. He was testifying in a murder case, and he testified that the defendant indirectly admitted to the crime. Clearly that's a material matter. What he did was, after saying that the defendant admitted to the crime, he lied about his qualifications as a witness. He denied having received benefits. [Storch] knew he received the benefits, and he flat out denied it . . . . Storch was trying to present himself in that case as someone who was lily-white. He was an experienced witness, he was precise in his answers, and he jousted with the defense attorney during the course of his examination.

The Attorney General went on to testify: "We expect that persons are going to come in and tell the truth . . . . That just plain didn't happen in the *Sanders* case. Mr. Storch was a person who lied about his credibility, and it was a serious risk to the judicial system."

**[5]** In sum, Storch perjured himself multiple times at Maxwell's trial and employed a signature method to "book" fellow inmates. Furthermore, Storch had a chronic pattern of dishonesty that both predated and followed Maxwell's trial. The evidence of Storch's later lies under oath does not establish the nature of his testimony at Maxwell's trial, but it remains relevant. It demonstrates a willingness to commit perjury and corroborates Maxwell's argument that Storch had a

signature modus operandi that he employed as a witness for the prosecution at Maxwell's trial.

**[6]** The preliminary inquiry, then, remains whether it was objectively unreasonable—in light of the evidence revealed over the course of the evidentiary hearing—for the Superior Court to find that Storch testified truthfully at the 1984 trial when he stated that Maxwell had confessed. The difficulty here is not whether Storch became a professional "snitch" who frequently committed perjury. That much is clear. Rather, the question is whether, as the state court concluded, in 1984 Storch remained an unsophisticated informant who was not yet employing the practices for which he would later be indicted. This requires us to determine whether the state court's factual determination was objectively unreasonable, a standard which, as we noted above, affords the state court determination the utmost deference.

Despite this deferential review, "deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Cockrell*, 537 U.S. at 340. We have, on occasion, concluded that a state court's factual determination was unreasonable. *See, e.g., Cooke v. Solis*, 606 F.3d 1206, 1216 (9th Cir. 2010) (holding that the state court's decision to uphold the Parole Board's denial of parole was an unreasonable determination of the facts in light of the evidence); *Taylor*, 366 F.3d at 1000 (holding that the state court's finding that petitioner's confession was voluntarily obtained was objectively unreasonable); *Hall*, 343 F.3d at 984 (holding that the state appellate court made an unreasonable determination of the facts in light of the evidence presented by finding that the falsity of the jailhouse informant's notes had not been proven at a hearing); *Nunes v. Mueller*, 350 F.3d 1045, 1057 (9th Cir. 2003) (holding that the state court's rejection of the petitioner's ineffective assistance of counsel claim was an

unreasonable determination of the facts in light of the evidence before the state court); *Bradley v. Duncan*, 315 F.3d 1091, 1094 (9th Cir. 2002) (affirming the district court's holding that the state's finding that the petitioner did not present sufficient evidence to deserve an instruction on entrapment was an unreasonable determination of the facts).

Furthermore, we have recognized the unreliability of jailhouse informants—who are themselves incarcerated criminals with significant motivation to garner favor—and on occasion have granted habeas or other relief where a defendant was convicted as a result of fabricated or potentially fabricated testimony. *See*, *e.g.*, *Hall*, 343 F.3d at 985 (reversing the district court's denial of habeas relief where a 1985 California jailhouse informant later confessed to perjury and the alteration of evidence); *Jackson v. Brown*, 513 F.3d 1057, 1060-61 (9th Cir. 2008) (affirming the district court's partial grant of habeas relief where a 1980s California jailhouse informant had not disclosed the full benefit he received in exchange for his testimony); *Goldstein v. City of Long Beach*, 481 F.3d 1170, 1171 (9th Cir. 2007), *reversed on other grounds by Van de Kamp v. Goldstein*, 129 S. Ct. 855 (2009) (noting that Goldstein was granted habeas relief when it was revealed that a 1980s California jailhouse informant had not disclosed that his sentence was reduced in return for testimony)[9]; *Reynoso v. Giurbino*, 462 F.3d 1099, 1102 (9th Cir. 2006) (granting habeas relief where counsel was ineffective in failing to cross-examine the 1990 California jailhouse informant about his motivation for testifying and the informant's testimony was suspiciously similar to a recent television broadcast about the case); *Bernal-Obeso*, 989 F.2d at 333 (vacating a defendant's conviction on direct review and remanding the case back to the district court for an evidentiary hearing to determine

[9]*See also Goldstein v. Harris*, 82 F. App'x 592 (9th Cir. 2003) (affirming the grant of habeas relief); *Goldstein v. City of Long Beach*, 603 F.Supp.2d 1242 (C.D. Cal. 2009) (noting that the informant in *Goldstein* was likened to "another notorious informant, Sidney Storch . . . .").

whether the government informant had lied about prior con-
victions); *but see Hovey v. Ayers*, 458 F.3d 892, 898 (9th Cir.
2006) (denying habeas relief where failure to impeach a 1980
California jailhouse informant was not ineffective assistance
of counsel); *Morales v. Ornoski*, 439 F.3d 529, 534 (9th Cir.
2006) (denying habeas relief where petitioner's claim that
prosecution knowingly presented a 1980s California jailhouse
informant's false testimony was harmless).

**[7]** Based on our review of the state court records, and in
particular the evidence that was presented at the Superior
Court's evidentiary hearing, we conclude that the state court's
conclusion that Storch testified truthfully was an unreasonable
determination of the facts. There is simply too much evidence
of Storch's pattern of perjury to conclude otherwise. At the
time of Maxwell's trial, Storch was already employing the
"booking" formula that he would later teach others and for
which he would become famous; the housing records show
that Storch had physical proximity to Maxwell; Storch openly
admitted that he was in possession of a newspaper article
about the murders; the newspaper article itself mentioned all
of the specific facts to which Storch testified—namely, that
the police had found Maxwell's palm print on a nearby park
bench; and, finally, Storch contacted Deputy District Attorney
Sterling Norris with the news of his cellmate's spontaneous
confession and negotiated his own deal in exchange for his testi-
mony.[10]

The Superior Court arbitrarily cabined Storch's perjury
methods to a time period starting after 1984, and, in spite of
the numerous known lies Storch told at Maxwell's trial,

---

[10]Storch and Sterling Norris seem to have had an ongoing relationship.
After testifying in *People v. Sheldon Sanders*, No. A039120 (L.A. Super.
Ct. Apr. 25, 1988), Storch asked the prosecution for money. Storch stated,
"[p]erhaps I've been spoiled by the likes of Mr. Norris . . . but I've usually
been allowed $30.00 from petty cash . . . and an OK for the Investigator
to stop and get me some smokes and candy."

unreasonably found his testimony truthful. In 1984, Storch was 37 years old and already a career criminal. He had committed crimes of deceit, and had been arrested at least 13 times and convicted of at least three felonies. Storch told numerous confirmed lies at Maxwell's trial, was known as dishonest at the time of trial, was an experienced informant according to the testimony of three LAPD officials, and employed his signature method to "book" Maxwell. If Storch was a neophyte informant at the time of Maxwell's trial, his inexperience showed not in his forthrightness, but, rather, in the lack of creativity in the lies he told. Storch simply repeated facts about the Skid Row Stabber killings contained in a newspaper article he admitted to possessing, and he offered no details about any of the crimes that were not already public and in widespread print. Storch testified at Maxwell's trial because he wanted to obtain a benefit—a reduction in his sentence—and, because he was dishonest, he was willing to say or do anything to obtain that goal.

As we have observed, "informants are cut from untrustworthy cloth and must be managed and carefully watched." *Bernal-Obeso*, 989 F.2d at 333. A failure of vigilance by the prosecuting authorities, as was epidemic in Los Angeles County in the 1980s, resulted in widespread failure to "prevent [criminal informants] from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom." *Id*. As our own Judge Stephen Trott has explained in a law review article on the topic: "The most dangerous informer of all is the jailhouse snitch who claims another prisoner has confessed to him. The snitch now stands ready to testify in return for some consideration in his own case. Sometimes these snitches tell the truth, but more often they invent testimony and stray details out of the air." Trott, *supra*, at 1394.

**[8]** Here, Storch lied about Maxwell's confession in order to reduce his own jail time. Storch went on to testify for the prosecution, and to lie, in numerous other cases. He became

one of Los Angeles County's most infamous jailhouse informants and he operated at the height of the County's jailhouse informant scandal. We cannot "reasonably conclude that the finding" that Storch testified truthfully at Maxwell's trial "is supported by the record." *Taylor*, 366 F.3d at 1000. "AEDPA, although emphasizing proper and due deference to the state court's findings, did not eliminate federal habeas review. Where there are real, credible doubts about the veracity of essential evidence and the person who created it, AEDPA does not require us to turn a blind eye." *Hall*, 343 F.3d at 984 n.8. We conclude, based on the record before the state court, that it was an objectively unreasonable determination of the facts to find that Sidney Storch was telling the truth at Maxwell's trial in 1984. 28 U.S.C. § 2254(d)(2).

## 2. Due Process Right

Having concluded that Storch's testimony was false, we next consider whether being convicted on the basis of Storch's false testimony violated Maxwell's right to due process under the Fourteenth Amendment. *See Agurs*, 427 U.S. at 103. Maxwell argues that his conviction based on false material evidence violated his due process rights under the Fourteenth Amendment, and we agree.

First, because the state court's decision was "based on an unreasonable determination of the facts" under § 2254(d)(2), the AEDPA deference no longer applies. *Detrich*, 619 F.3d at 1059. Therefore, we proceed to " 'resolve [Maxwell's related due process] claim without the deference AEDPA otherwise requires.' " *Id*. (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)). As we recently explained in *Detrich*, this makes sense and is in accord with the deference principles of AEDPA because—in light of the state court's reliance on incorrect facts—"we do not know what the state court would have decided . . . [and] there is no actual decision to which we can defer." *Id*. at 1060.

**[9]** In *Killian*, as here, the defendant was convicted of murder based, in large part, on the testimony of a jailhouse informant. 282 F.3d at 1206-07. In that case, we concluded that irrespective of whether the prosecutor knew that the informant had given false testimony, "one [could not] reasonably deny that [the jailhouse informant] gave perjured testimony at [petitioner's] trial." *Id.* at 1208. We went on to "determine whether 'there is a reasonable probability that [without all the perjury] the result of the proceeding would have been different.' " *Id.* at 1204, 1208 (citing *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994) and *Bagley*, 473 U.S. at 682)) (alterations in the original). We concluded that the perjury of "the prosecution's main witness" undermined confidence in the verdict and, therefore, to permit the defendant's conviction to stand on the basis of such evidence violated the petitioner's due process rights. *Id.* at 1208, 1211. Accordingly, we reversed the district court's denial of habeas relief. *Id.* at 1211. We explained that "a government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence. A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness." *Id.* at 1209 (internal quotation marks omitted).

*Hall* similarly concerned a habeas defendant who challenged his conviction, arguing that it was based on false material evidence in violation of his due process rights. 343 F.3d at 981. In that case, the habeas defendant objected to the admission of incriminating handwritten notes that a jailhouse informant supplied to the prosecution. *See id.* The defendant argued that whether or not the prosecution knew that the jailhouse notes admitted into evidence at trial were false at the time of trial, "to allow his conviction to stand, based on the present knowledge that the evidence was falsified, is a violation of his right to due process under the Fourteenth Amendment." *Id.* (citing *Agurs*, 427 U.S. at 103). We agreed. We first determined that the alleged written confession, which a

jailhouse informant had provided, was false and material evidence. *Id.* at 982-85. Accordingly, we concluded that to permit the petitioner's conviction to stand on the basis of such false material evidence violated his constitutional rights, and we reversed the denial of habeas relief. *Id.* at 985 (reversing the denial of habeas relief "[b]ecause false and material evidence was admitted at [petitioner's] trial in violation of his due process rights"). The Second Circuit has similarly explained that "[i]t is simply intolerable . . . if a state allows an innocent person to remain incarcerated on the basis of lies." *Sanders v. Sullivan*, 863 F.2d 218, 224 (2d Cir. 1988) (reversing the denial of habeas relief and holding that the petitioner's due process rights were violated when the petitioner in that case was convicted based on the material testimony of a witness who recanted); *see also United States v. Wallach*, 935 F.2d 445, 473 (2d Cir. 1991) (holding that the perjury by a key government witness, irrespective of whether the government knew of the perjury at the time of trial, "infected the trial proceedings" and required reversal).

[10] Here, we have resolved the threshold factual question of falsity and concluded that Storch perjured himself when he testified that Maxwell confessed. We have also resolved the threshold legal question and conclude that under *Hall* and *Killian*, to permit a conviction based on uncorrected false material evidence to stand is a violation of a defendant's due process rights under the Fourteenth Amendment. We proceed, therefore, to consider whether Storch's testimony was material.

[11] A constitutional error resulting from the prosecution's failure to correct false testimony requires a new trial only if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc). In order to determine whether Storch's perjury here undermines confidence in the verdicts, we again compare this case to *Hall* and *Killian*. In *Hall*, there was "absolutely no physical or forensic

evidence connecting [the defendant] to the body or the alley in which it was found," and the notes supplied by the informant, like Storch's testimony, provided a confession in what was otherwise a weak case. 343 F.3d at 978 (noting that "[u]nable to find any physical evidence to connect Hall to the murder, the prosecution relied upon two documents provided by a jailhouse informant"). Because there was "a reasonable likelihood that the introduction of the falsified notes affected the jury's verdict," we concluded that the jailhouse notes were material and reversed the district court's denial of habeas relief. *Id.* at 984-85 (citing *Giglio*, 405 U.S. at 154).

Like *Hall*, *Killian* required us to "decide whether the use of perjured testimony . . . justifie[d] habeas relief." 282 F.3d at 1206. In *Killian*, the jailhouse informant made "virtually the whole case for the government," and the prosecution emphasized the informant's testimony during closing arguments. *Id.* at 1209. Because the jailhouse informant was the "make-or-break witness" for the state, we concluded that there was a "reasonable probability that without all the perjury the result of the proceeding would have been different." *Id.*

Here, as in *Hall* and *Killian*, Storch was the "make-or-break" witness for the State. Storch's testimony was the centerpiece of the prosecution's case. Nearly all of the other evidence against Maxwell was circumstantial. In deciding whether to file murder charges against Maxwell, the prosecution itself acknowledged in internal written notes that were discovered during the evidentiary hearing that its case was "weak from an evidential standpoint." The only evidence that linked Maxwell to the Jones murder was the in-courtroom voice identification of Maxwell by a witness who had been unable to pick Maxwell out of a lineup in which he spoke, and the fact that Maxwell possessed a knife consistent with Jones's stab wound. The only evidence that linked Maxwell to the Garcia murder was Maxwell's palm print on a nearby bench in an area Maxwell admitted frequenting, some muddy and consistent footprints, and a generic Bic lighter found in

Maxwell's pocket at the time of arrest. In sum, Storch's testimony that Maxwell confessed to making a "mistake" in the commission of the Garcia murder was the prosecution's prize evidence. Furthermore, Storch's testimony went to both the Garcia and Jones murders; in fact, Storch's testimony was offered to establish Maxwell as the perpetrator of all ten of the Skid Row Stabber killings. Specifically, the State argued during closing arguments and continues to argue in its brief on appeal, that Storch's testimony "was offered primarily to prove that [Maxwell] had admitted responsibility for each of the ten murders."

Storch's testimony is significant not just because of the paucity of other evidence but also because of the content of his testimony. As this court and the Supreme Court have noted, the importance of " 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J., dissenting)); *see also Moore v. Czerniak*, 574 F.3d 1092 (9th Cir. 2009) (citing *Fulminante* and concluding that counsel's failure to move to exclude the petitioner's confession was prejudicial). The importance of Storch's testimony was underscored by the prosecution in its closing argument, when Norris emphasized Storch's testimony. *See Hall*, 343 F.3d at 976 (finding it significant that the prosecutor emphasized the jailhouse informant's note in his closing argument in reversing denial of habeas relief). The jury also asked to see the transcript of Storch's testimony during deliberation, highlighting its import.

**[12]** In sum, the Superior Court's finding that Storch testified truthfully at Maxwell's trial was an unreasonable determination of the facts in light of the evidence that was presented at the state court evidentiary hearing, and Storch's false testimony prejudiced Maxwell's trial. The State's reliance on that perjured testimony undermines confidence in the verdict. *See Killian*, 282 F.3d at 1210 (citing *Strickler v.*

*Greene*, 527 U.S. 263, 290 (1999)). Because there is a reasonable probability that Storch's perjury affected the judgment of the jury, we must reverse the denial of Maxwell's habeas petition as to this claim. *See Agurs*, 427 U.S. at 103.

## C.    *Brady* **violation**

Next, Maxwell argues that the prosecution violated his due process rights under *Brady*, 373 U.S. at 87, when it failed to disclose material evidence about Sidney Storch. Because no state court has offered a reasoned decision for denial of the claim, we conduct an independent review of the record to determine whether the California Supreme Court's summary denial of Maxwell's *Brady* claim constituted an unreasonable application of *Brady*. *See Greene*, 288 F.3d at 1088-89. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Here, we conclude that the state court could not have reasonably determined that the suppressed evidence relating to the deal Storch received and Storch's prior cooperation with law enforcement as an informant was not material. The failure to disclose this information undermines confidence in the verdict, and we, therefore, reverse the district court's denial of habeas relief on this claim.[11]

There are three components of a *Brady* claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either will-

---

[11]Maxwell also argues that the prosecution withheld material evidence related to Storch's reputation, Storch's heroin use, the housing records, and the Sheriff's Department's practice of moving informants into cells with defendants to facilitate police investigations. Because Maxwell has failed to establish that any of this evidence, if suppressed, was material, we do not discuss Maxwell's *Brady* claim with respect to this evidence.

fully or inadvertently; and (3) prejudice must have ensued. *Strickler*, 527 U.S. at 281-82. The prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87; *see Kyles*, 514 U.S. at 437 (holding that an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Strickler*, 527 U.S. at 280. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial, *see Kyles*, 514 U.S. at 434. Whether the suppressed evidence was material must be considered collectively, not item by item. *Id.*

Here, Maxwell argues that the State failed to disclose (1) that the sixteen-month deal Storch received in exchange for his testimony was not the original deal offered to him, but rather a deal Storch independently negotiated for himself; and, (2) Storch's prior informant history.

### 1. Failure to disclose the details of Storch's deal

At the time of trial, Storch maintained that his primary motivation for testifying was to do his civic duty, and Storch completely denied the existence of any deal with the prosecution. Storch did ultimately concede during cross-examination that he had received a reduced sentence of sixteen months for his pending cases in exchange for his testimony. Yet, Storch never revealed that his sixteen-month deal was the second deal he received and, more importantly, one he had negotiated independently from his public defender. In fact, when he was asked directly on cross-examination, Storch denied any prior deals and the prosecution never corrected this lie.

At the evidentiary hearing, Arnold Lester, the public defender who represented Storch at the time of Maxwell's

trial, testified that he had worked out a guilty plea deal to consolidate Storch's five pending cases into a combined total sentence of 36 months. Lester further testified that this was a reasonable sentence given the number of counts and Storch's prior record. Lester testified that Storch, however, proceeded to work out privately the sixteen-month sentence deal that he ultimately received. Maxwell was not informed before or at trial of the prior 36-month deal, and the prosecution never corrected Storch when he stated that there was no prior deal. Maxwell argues that the State violated *Brady* when it failed to disclose that the sixteen-month deal was Storch's second deal, one that he privately negotiated without the assistance of his public defender.

**[13]** In general, *Brady* requires prosecutors to disclose any benefits that are given to a government informant, including any lenient treatment for pending cases. *See, e.g., Giglio*, 405 U.S. at 150; *Benn v. Lambert,* 283 F.3d 1040, 1057 (9th Cir. 2002). The question here is whether the prosecution's failure to disclose the details of the prior deal, specifically Storch's negotiation of a subsequent deal, was material. In *Benn*, we held that, among other evidence withheld by the prosecution, the prosecution's failure to disclose a subsequent deal—even where that deal resulted in minimal benefit to the informant—prejudiced the defendant. *Benn*, 283 F.3d at 1057. "The undisclosed benefits that [the informant] received added significantly to the benefits that were disclosed and certainly would have 'cast a shadow' on [the informant's] credibility. Thus, their suppression was material." *Id*. at 1058.

**[14]** This case is different than *Benn* insofar as *Benn* concerned a failure to disclose a *better* (albeit only slightly) deal. Here, Maxwell was informed at trial of the deal that Storch ultimately received. Nonetheless, the fact that Storch pursued an additional benefit to himself—independent of and subsequent to the agreement worked out by his public defender—would have provided Maxwell with impeaching evidence relevant to Storch's motivation for testifying and of a different

character than the other impeachment evidence which came to light. Storch testified that "his initial contact with anybody about [testifying in the Maxwell case] was with the chaplain's office in terms of this . . . I was looking for guidance, more or less." When asked during cross-examination if he had any "intention to lighten [his] load [i.e., sentence]," Storch adamantly stated that his intentions were not to reduce his sentence: "Initially, no, sir, and I will say strongly that way, initially no." Evidence that Storch had already secured a plea agreement and came forward to testify at Maxwell's trial for the sole purpose of working a new and better deal would have directly impeached Storch's testimony for why he came forward. As the Supreme Court noted in *Napu*, "we do not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one." 360 U.S. at 270. Furthermore, the details of Storch's plea negotiations would have helped to establish Storch's sophistication and directly contradicted the naivete he professed at trial. The fact that Storch had worked a deal with Norris without his public defender would have been the only evidence—other than the evidence of Storch's informant past, which was also suppressed—of Storch's informant sophistication. Such evidence differed substantially from Storch's other lies, which came to light during cross-examination. Storch was not some innocent inmate who happened to overhear his cellmate's confession and then had to struggle with the moral dilemma of whether to come forward, seeking religious guidance, as he represented. Storch knew that his testimony against Maxwell was bartering material. He used his know-how and connections to negotiate a better deal.

[15] In sum, the evidence the government withheld would not simply have been cumulative of the impeachment evidence brought out during cross-examination of Storch at trial. Rather, it would have created substantial doubt as to Storch's credibility, particularly with respect to his professed naivete.

The details of Storch's own agreement with the prosecution, and the fact that Storch had negotiated the subsequent deal independent of his public defender, would have allowed defense counsel to discredit Storch on a novel basis. The prosecution's failure to correct Storch's false testimony about his prior deals was prejudicial.

### 2. Failure to disclose Storch's experience as an informant

Maxwell further argues that the prosecution violated his due process rights when it failed to disclose Storch's prior informant activities. This evidence, Maxwell argues, would have impeached Storch's credibility and shown him to be a sophisticated informer. The Superior Court did not dispute that Storch was an undisclosed police informant, but the court characterized him as unsophisticated because there was no record of him receiving any benefit in exchange for his informant activities prior to Maxwell's case.

Here, as in *Benn*, Storch denied that he had previously worked as an informant. *Benn*, 283 F.3d at 1058; *see also United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986). Specifically, Storch stated that he had never testified for the district attorney and represented himself as someone new to the informant world. For its part, the prosecution did not reveal that, although Storch may technically not have testified for the state, he had on several occasions aided in investigations and acted as an informant on numerous previous occasions.

At the evidentiary hearing, Maxwell learned for the first time that Storch had assisted the LAPD's forgery division in the investigation of multiple forgery cases prior to Maxwell's trial. As this court explained in *Benn*, "[t]he state argues that this undisclosed evidence about [the informant's] history was not material; however . . . undisclosed evidence that an informant had previously participated in a . . . investigation was

important impeachment evidence that could have been used to discredit the informant's trial testimony that he had not previously participated in that type of investigation." *Benn*, 283 F.3d at 1058; *see also Shaffer*, 789 F.2d at 688-89 (holding that defendant's undisclosed prior involvement in a state investigation contradicts his prior testimony and was material).

**[16]** In light of the import of Storch's testimony, evidence of Storch's prior dealings with the forgery unit could have been used to discredit Storch had it been revealed at the time of trial. Furthermore, it would have provided additional evidence that Storch was a sophisticated informant with developed connections and relationships within the LAPD. Such information may have led Maxwell to investigate Storch more thoroughly and led to the discovery of the information that only came to light at the evidentiary hearing—namely, that Storch was an experienced informant with a history of lying. Storch's involvement in prior forgery investigations contradicts his representations at trial that he had never worked as an informant for the District Attorney's office. It also provides additional grounds for a jury to question Storch's credibility, grounds which relate to the prosecution's failure to disclose the fact that Storch's plea deal was a subsequent one that he negotiated.

### 3.  Cumulative *Brady* errors

In determining whether the suppression of impeachment evidence is sufficiently prejudicial to rise to the level of a *Brady* violation, we must analyze the totality of the undisclosed evidence "in the context of the entire record." *Agurs*, 427 U.S. at 112; *see also Bagley*, 473 U.S. at 682. The cumulative effect of all the undisclosed evidence may violate due process and warrant habeas relief under AEDPA. *Barker v. Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (explaining the "Supreme Court's requirement that the materiality of the

withheld evidence be analyzed cumulatively . . . not item by item" (citing *Kyles*, 514 U.S. at 436)).

Here, the prosecution itself admitted that the evidence against Maxwell was weak, that Maxwell had consistently maintained his innocence, and that the police testimony about the date of the palm print was speculative. For these reasons, and those explained previously, Storch's testimony was crucial to the prosecution's case.

**[17]** The prosecution failed, however, to disclose multiple pieces of critical impeachment information that could have been used to undermine the credibility of Storch. Analyzed collectively, the withheld impeachment evidence that Storch had negotiated himself a better deal coupled with the evidence of Storch's undisclosed informant past would not simply have been cumulative of the impeachment evidence introduced at trial, which included lies about his level of education and number of felony convictions, but would have created substantial doubt as to Storch's credibility for different reasons. The withheld evidence went to Storch's sophistication and motivation in his capacity as a prosecution informant and not, like the other evidence produced at trial, to his general propensity for dishonesty. Even if the lies did not provide a novel angle of attack on Storch's credibility, which we believe they do, as we explained in *Killian*, "the finders of fact were deprived of the fundamental inference that if [the government informant] lied about X, Y, and Z, it is quite likely that he lied about Q, R, and S." 282 F.3d at 1209. The evidence withheld revealed that Storch, like the witness in *Benn*, was "completely unreliable, a liar for hire, [and] ready to perjure himself for whatever advantage he could squeeze out of the system." 283 F.3d at 1059 (holding that the prosecution's failure to disclose multiple pieces of critical impeachment evidence that could have been used to undermine credibility of the jailhouse informant who testified that defendant admitted committing the murders was sufficient to violate *Brady*).

**[18]** Because Storch's testimony implicating Maxwell was critical to Maxwell's conviction, the jury's assessment of Storch's credibility was crucial to the outcome of the trial. If the jury had not believed Storch, Maxwell may not have been convicted. The prosecution's failure to disclose this impeachment evidence undermines confidence in the outcome of Maxwell's trial, and the California Supreme Court's decision to the contrary was an unreasonable application of *Brady*.

## VI.   Conclusion

Storch was one of the most infamous jailhouse informants in Los Angeles history. In particular, as confirmed by Kryniak's and Marcus's testimony, Storch had a propensity to go after high profile cases. The "Skid Row Stabber" case would have been just such a case, and Storch's testimony at Maxwell's trial is a textbook example of the "booking" method that Storch helped make famous. Based on the evidence brought to light during the lengthy evidentiary hearing, we conclude that the state court's finding that Storch did not give false testimony was an unreasonable determination of the facts in light of the evidence. We further conclude that there is a reasonable probability that this false testimony affected the jury's verdict. Because the State convicted Maxwell on the basis of false and material evidence in violation of his due process rights, we direct the district court to grant Maxwell habeas relief on this claim. We further conclude that the prosecution withheld material evidence in violation of *Brady*.

**[19]** We reverse the district court's judgment and remand with directions to grant a writ of habeas corpus directing the state to provide Maxwell with a new trial in a reasonable amount of time or to release him.

REVERSED AND REMANDED.