Filed 4/15/13  P. v. Tucker CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D060958 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD225855) |
| MAURICE DAVID TUCKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.


A jury convicted Maurice David Tucker of the first degree murder of Stephen Cleveland (Pen. Code,[1] § 187, subd. (a)) and shooting at an inhabited dwelling (§ 246). It found true allegations that Tucker committed the offenses for the benefit or at the direction of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)); and also that he was a principal in the offenses, during which a principal personally used a

---

1    All statutory references are to the Penal Code.

firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)). The court sentenced him to a 50-year-to-life prison term.

Tucker contends: (1) there is insufficient evidence to corroborate the testimony of an informant who implicated him in a conspiracy to commit Cleveland's murder; (2) the trial court prejudicially erred by instructing the jury with CALCRIM No. 315; and (3) his conviction for shooting at an inhabited dwelling is not supported by substantial evidence. We reject these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

Tucker, known to others by the moniker Tuck, or Tuck-Bo, is a documented member of the O'Farrell Park Banksters criminal street gang (the O'Farrell gang), which is a rival of the Lincoln Park criminal street gang. June 9 is a main "gang holiday" for the O'Farrell gang and its associated gang, Skyline Piru.

On June 9, 2007, Stephen Cleveland, a person believed to be a member of the Lincoln Park gang who associated with known Lincoln Park gang members, was shot multiple times and killed near his house on 65th Street in San Diego after walking his girlfriend, Sharnay Robinson, to her car. That night, at about 7:30 or 8:00 o'clock, Robinson and Cleveland were at the driver's side door of her car parked across the street from his residence when a dark green SUV drove up and came to a sudden screeching stop. The driver's window was partially rolled down, and the driver said to Cleveland, "Yo, what's up?" Cleveland, who seemed confused, responded by asking who the person was. The driver said, "You know who this be, it's Tookie." Robinson later testified the

2

person could have said "Tuckie" or "2B." The passenger door of the SUV opened and Cleveland took off running. Robinson saw a person exit the vehicle and start running after and then shooting at Cleveland. She described the shooter as extremely tall, dark-skinned, and skinny. Tucker is 6 feet 3 inches tall, and around the time of his trial weighed 160 pounds.

Responding police recovered six expended nine-millimeter shell casings from the west side of the street across from the Cleveland residence, all fired from the same gun. A cell phone was also found at the scene, and later was determined to belong to Charles Neal, a member of the Skyline Piru criminal street gang, who also went by the monikers Choo-Choo, Little U.K. Banty, and 2 B Dat.

On the night of Cleveland's murder, Neal arrived in a dark SUV to a Travel Inn in Chula Vista where his then girlfriend Vanity August was staying, and told her he had not contacted her because he had lost his cell phone. August was watching the news, which had earlier reported on Cleveland's murder. Neal, who arrived with a man who was not Tucker, told August to turn the television on to the news and then tried to contact someone on the other man's phone. Both men were wearing dark clothes. After 20 or 30 minutes, Neal and the other man left in the SUV. Neal and August later dropped the SUV off in Spring Valley.

August testified at Tucker's trial that in or about May or June 2007, she, Neal, Tucker and Marquara Harvey purchased two prepaid phones in San Francisco, and at Neal's direction used a false name and address, as well as a Louisiana area code. Cell phone records for the pre-paid phone purchased for Tucker with a Louisiana area code

3

showed that on June 9, 2007, ten calls were made from his phone between 9:12 p.m. and 10:00 p.m., and seven calls were made between 10:08 p.m. and 10:37 p.m. from the Chula Vista area around the Travel Inn. At 10:57 p.m. and 11:32 p.m., calls were placed on Tucker's phone from a location closer to his house.

The prosecution put on testimony from Joseph Jamal Brown, a member of the O'Farrell gang, who was at the time serving a sentence for armed robbery. Before his testimony, he faced 22 years in prison, but as a result of his cooperation, he was facing between five and 15 years. Brown testified that Tucker, who he also knew as "Tuck-Bo" or "Tuck-6," was another member of the O'Farrell gang. He testified that he was with Tucker and Neal on June 9, 2007, after Brown and Tucker had been at a park to watch a show, when some Lincoln Park gang members appeared and interrupted the performance. That evening at Tucker's house, Neal and Tucker talked about going to "ride" on Lincoln, which meant they were going to do some sort of violence or a shooting. Neal and Tucker changed into black clothing and left in a green SUV dropped off by a friend of Brown's, Arrow Morris. Neal had arrived at Tucker's house in an Impala. A couple of days later, Tucker told Brown that he was driving the SUV on 65th Street with Neal when they saw Cleveland and backed up the SUV, after which Neal got out and confronted him and they exchanged words. Tucker told Brown that he (Tucker) got out of the SUV, chased Cleveland, and shot him in the neck.

According to Brown, weeks later, Brown visited Tucker at Tucker's house, and at that time Tucker told Brown that Neal had dropped his cell phone at the scene, and that police had it. Brown also testified that at some point before Cleveland's murder, Tucker

4

told him that Tucker and Cleveland had exchanged words at a "Lil Wayne" music concert, and Tucker was "jumped" by a number of Lincoln Park gang members. Tucker was angry and upset about the incident.

Robinson testified at Tucker's trial that although she could not identify him in a photographic lineup after the incident, Neal was the person she saw in the SUV on the night of Cleveland's murder. She also testified that a few months after Cleveland's death, she saw Tucker at a party staring at her and felt a "negative vibe," but after she found him standing in front of her, she danced with him to make it seem as if she did not know him. She had heard the name Tuck-Bo but had never met Tucker. According to Robinson, after dancing with Tucker, she got scared and left the party because she knew he was the man she saw shooting at Cleveland.

Cleveland's sister testified that in April 2007, she was at a "Lil Wayne" music concert and witnessed her brother engaged in a "big brawl" with 15 or 20 other African-American men.

On the night of June 9, 2007, Prudencio Flores was at his home when he heard a series of gunshots—two shots, and then a few seconds later, another three—outside his house. When he went outside, he heard people screaming and found Cleveland's body facedown inside his garage. At the time, Flores had a metal locker, as well as a mattress and bedframe, in front of his garage, and he moved them so that paramedics could work on Cleveland. About a week later, Flores found a bullet hole in the locker and a bullet in the mattress, which he was cutting up to place in the trash. He testified the locker was undamaged before the shooting, and he believed the bullet and damage were the result of

5

the shooting. A forensic firearms specialist testified that the six casings found on the street were nine-millimeter luger caliber, and the bullet found in Flores's mattress was a nine-millimeter luger caliber missile, though the specialist could not identify it as coming from the same gun as the other casings because there were not enough markings on it.

*Defense Evidence*

A San Diego Police Department detective testified that on or about June 25, 2007, she received a photograph of Marcus Marshall, Tucker's brother, from Robinson's mother. The detective testified that Robinson had told her mother that Marshall was the driver of the SUV on the night of Cleveland's murder.

Danny Davis, who was incarcerated with Neal at the California Youth Authority, testified that Neal told him he was not with Tucker when he shot Cleveland.

DISCUSSION

I. *Corroboration of Brown's Testimony*

Tucker contends his convictions must be reversed as a result of the People's introduction of Brown's testimony to prove an uncharged conspiracy to commit Cleveland's murder. He first argues the testimony of Brown, a jailhouse informant, is inherently unreliable and thus the judgment violates his federal constitutional right to due process. He further argues his conviction violates state law in that there is insufficient evidence to corroborate Brown's testimony as required under section 1111.5, which became effective January 1, 2012. He argues section 1111.5 should apply retroactively to his conviction, which was not yet final on appeal when the statute became effective.

6

The People respond that section 1111.5 does not apply to Brown's testimony because none of Brown's conversations with Tucker implicate the statute, whose provisions are assertedly limited to conversations between the defendant and the informant that occur while both are in custody. The People further argue that even if section 1111.5 applied, Tucker is not entitled to the benefits of the provision because it is not retroactive. Finally, the People argue Brown's testimony was adequately corroborated by Robinson's testimony, as well as by testimony from Neal's girlfriend and others as to the cell phone purchases and usage.

Section 1111.5 provides that a judge or jury may not convict a defendant "based on the uncorroborated testimony of an in-custody informant." (§ 1111.5, subd. (a).) It defines an " 'in-custody informant' " as "a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or correctional institution." (§ 1111.5, subd. (b).)[2]

_____

[2]    In full, section 1111.5 provides: "(a) A jury or judge may not convict a defendant, find a special circumstance true, or use a fact in aggravation based on the uncorroborated testimony of an in-custody informant. The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense, the special circumstance, or the evidence offered in aggravation to which the in-custody informant testifies. Corroboration is not sufficient if it merely shows the commission of the offense or the special circumstance or the circumstance in aggravation. Corroboration of an in-custody informant shall not be provided by the testimony of another in-custody informant unless the party calling the in-custody informant as a witness establishes by a preponderance of the evidence that the in-custody informant has not communicated with another in-custody informant on the subject of the

7

We need not reach Tucker's arguments as to section 1111.5 or its retroactivity[3] because we agree with the People that Brown was not an "in-custody informant" within the plain meaning of the statute.  Our fundamental task is to " ' "determine the Legislature's intent so as to effectuate the law's purpose." '  [Citation.]  ' "If the statute's text evinces an unmistakable plain meaning, we need go no further." ' "  (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 803; see also *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1131 [" 'When interpreting statutes, we begin with the plain, commonsense meaning of the language used by the Legislature.  [Citation.]  If the language is unambiguous, the plain meaning controls' "].)  Thus, where the statutory language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature's intent.  (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 992.)

The provisions of section 1111.5 relevant to the question here need no construction.  Subdivision (b) plainly requires that to qualify as an in-custody informant

testimony.  [¶]  (b)  As used in this section, 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or correctional institution.  Nothing in this section limits or changes the requirements for corroboration of accomplice testimony pursuant to Section 1111."

[3]    In *People v. Gonzalez* (2012) 210 Cal.App.4th 724, the Second District, Division One Court of Appeal held that section 1111.5 does not lessen or mitigate a criminal penalty for a particular crime, and thus was not an ameliorative law falling within an exception to the general rule of prospectivity.  (*Id*. at pp. 733-735.)  Thus, the court declined to apply the statute retroactively to a defendant who was convicted and sentenced before the statute's effective date.

within the meaning of the statute, the informant must testify about a defendant's statements made while both the informant and defendant were incarcerated. Here, Brown recounted statements made by Tucker on June 9, 2007, and at other times before Tucker was arrested and charged with Cleveland's murder, and before Tucker's incarceration. And neither Brown nor Tucker were incarcerated at the time Tucker made the alleged incriminating statements. In short, Brown's testimony was not "based on statements allegedly made by [Tucker] while both [Tucker] and [Brown] were held within a city or county jail, state penal institution, or correctional institution." (§ 1111.5, subd. (b).) Accordingly, section 1111.5 does not apply to Brown's testimony.

Tucker nevertheless maintains that Brown's testimony is inherently unreliable, resulting in a violation of his federal constitutional due process rights. His argument, however, is supported only by its own premise: Tucker argues Brown's testimony is "unreliable because the testimony of an in-custody informant who barters his testimony to the government in exchange for his freedom is inherently unreliable." We reject the contention.

Tucker's argument rests on a grand jury report as well as a law review article that was quoted by the Ninth Circuit in *Maxwell v. Roe* (9th Cir. 2010) 628 F.3d 486. In *Maxwell*, the court held the defendant's federal constitutional due process rights were violated where an established jail house informant witness (one of the "most infamous jailhouse informants in Los Angeles history") with a "long and public history of dishonesty" (*id*. at pp. 498, 513) "was the 'make-or-break witness' for the State." (*Id*. at pp. 507-508.) It was undisputed that the informant perjured himself multiple times at the

defendant's murder trial, including lying about the defendant's confession. (*Id*. at pp. 501, 505-506.) Rejecting as objectively unreasonable the state court's finding that the informant truthfully testified at the defendant's trial, the Ninth Circuit concluded that the informant's testimony was in fact false. (*Id*. at pp. 503-507.) It held a defendant's conviction on the basis of uncorrected false material evidence would be a violation of a defendant's right to due process under the Fourteenth Amendment. (*Id*. at p. 506.) In that particular case, the Ninth Circuit held the informant's testimony, which purported to recount the defendant's confession to ten murders and was the "centerpiece" of the prosecution's case otherwise consisting of only circumstantial evidence, prejudiced the defendant and entitled him to habeas relief. (*Id*. at pp. 506-508.)

The circumstances here are entirely unlike those compelling habeas relief in *Maxwell v. Roe*, *supra*, 628 F.3d 486. First, Robinson, whose testimony was credited by the jury despite its weaknesses,[4] identified both Neal and Tucker as the men involved in Cleveland's shooting. Second, Brown's account was corroborated in many respects not only by Robinson, but also by the forensic evidence concerning the cell phone usage, and

---

[4] In connection with his claim of instructional error, Tucker recites what he characterizes as numerous weaknesses and inconsistencies in Robinson's testimony. He points out Robinson told police on the night of the shooting that she did not see any passengers in the SUV; she told police five days after the shooting that she did not see the shooter's face; she picked out someone other than Neal from a photographic lineup including Neal shown to her after the shooting, and could not identify Tucker in a photographic lineup; she did not tell police she had believed Tucker was the shooter after the party at which she danced with him; she never told officers she would recognize the shooter in a live lineup; and she sent police a picture of another person, Marcus Marshall, and told them in July 2007 she was "hundred percent positive" he was the driver on the night of Cleveland's death. Tucker points out that a homicide detective described the lighting conditions at the scene as "extremely poor" and that the street was "very dark."

by Cleveland's sister, who saw the fight that occurred at the music concert recounted by Brown. Corroborating evidence "may be circumstantial or slight and entitled to little consideration when standing alone" and it "need not by itself establish every element of the crime, but it must, without aid from [Brown's] testimony, tend to connect the defendant with the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 985-986 [involving accomplice testimony].) Finally, Brown is not the sort of experienced jailhouse informant warned against by the *Maxwell* court, that is, one who employs a pattern method of gathering information and claims another prisoner has confessed to him.[5]

## II. *Instruction with CALCRIM No. 315*

Tucker contends the trial court prejudicially erred by instructing the jury with CALCRIM No. 315, pertaining to eyewitness identification, and listing as a factor for the jury to consider: "How certain was the witness when he or she made an identification."[6]

---

[5]   The *Maxwell* court wrote: "As our own Judge Stephen Trott has explained in a law review article on the topic: 'The most dangerous informer of all is the jailhouse snitch who claims another prisoner has confessed to him. The snitch now stands ready to testify in return for some consideration in his own case. Sometimes these snitches tell the truth, but more often they invent testimony and stray details out of the air.' " (*Maxwell v. Roe*, *supra*, 628 F.3d at p. 505.)

[6]   The court instructed with CALCRIM No. 315 as follows: "You have heard eyewitness testimony identifying the defendant. As with other witnesses, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event; how well could the witness see the perpetrator; what were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation; how closely was the witness paying attention; was the witness under stress when he or she

He maintains the instruction "erroneously informed the jurors that the degree of certainty claimed by an eyewitness at trial was a relevant factor to consider in assessing the accuracy of that eyewitness's identification testimony" and lacks scientific support. Pointing out the weaknesses in Robinson's testimony, Tucker further argues the instruction unfairly encouraged jurors to accept Robinson's in-court identification of Tucker, and gave her account an "unwarranted aura of veracity and accuracy . . . ." He argues the " 'certainty factor' should be applied, if at all, *only* to that certainty demonstrated by a witness during the initial, out-of-court identification procedure." According to Tucker, the error requires reversal of the judgment.[7]

Several courts, including the California Supreme Court, have addressed the predecessor to CALCRIM No. 315's eyewitness identification instruction, CALJIC No.

---

made the observation; did the witness give a description and how does that description compare to the defendant; how much time passed between the event and the time when the witness identified the defendant; was the witness able to pick the perpetrator out of a group; did the witness ever fail to identify the defendant; did the witness ever change his or her mind about the identification; how certain was the witness when he or she made an identification; are the witness and the defendant of different races; was the witness able to identify the defendant in a photographic or physical lineup; were there any other circumstances affecting the witness's ability to make an accurate identification?"

[7]     Tucker's counsel expressed no objection to the court's use of CALCRIM No. 315. Thus, assuming no forfeiture, Tucker's argument would have required the trial court to eliminate sua sponte the "witness certainty" language from the instruction. But the court in *People v. Ward* (2005) 36 Cal.4th 186, 213 expressly held there is no such obligation, and we are bound by the decisions of our state's Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

2.92.[8] (*People v. Ward*, *supra*, 36 Cal.4th at p. 213 [no sua sponte obligation to modify the witness certainty language of CALJIC No. 2.92]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232 [holding the "trial court did not err . . . in instructing the jury on the 'certainty' factor" where an expert testified without contradiction that a witness's confidence in an identification does not correlate with the accuracy of that identification]; *People v. Wright* (1988) 45 Cal.3d 1126, 1141, 1143 [holding CALJIC No. 2.92 "will usually provide sufficient guidance on eyewitness identification factors" and it is generally proper for a court to give CALJIC No. 2.92 after providing defense counsel an opportunity to suggest additional factors; disagreeing with dissent's suggestion that instruction was deficient for failing to explain the effects of the enumerated factors]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561-562 [holding trial court had no duty

---

8      CALJIC No. 2.92 provided: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crime[s] charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following: [¶] [The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;] [¶] [The stress, if any, to which the witness was subjected at the time of the observation;] [¶] [The witness' ability, following the observation, to provide a description of the perpetrator of the act;] [¶] [The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;] [¶] [The cross-racial [or ethnic] nature of the identification;] [¶] [The witness' capacity to make an identification;] [¶] [Evidence relating to the witness' ability to identify other alleged perpetrators of the criminal act;] [¶] [Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;] [¶] [The period of time between the alleged criminal act and the witness' identification;] [¶] [Whether the witness had prior contacts with the alleged perpetrator;] [¶] [The extent to which the witness is either certain or uncertain of the identification;] [¶] [Whether the witness' identification is in fact the product of [his] [her] own recollection;] [¶] [;] and [¶] Any other evidence relating to the witness' ability to make an identification."

13

to give or modify CALJIC No. 2.92 on its own motion and rejecting challenge to eyewitness certainty factor based on *Wright* and *Johnson*]; *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303 [rejecting challenge to eyewitness certainty factor enumerated in CALJIC No. 2.92 based on high court's approval in *Wright* and *Johnson*], disapproved on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452.)

In *People v. Wright*, *supra*, 45 Cal.3d at p. 1141, the court expressly approved a version of CALJIC No. 2.92 that told the jury to consider the degree of certainty in assessing the reliability of eyewitness identification evidence. (Accord, *People v. Johnson*, *supra*, 3 Cal.4th at pp. 1231-1232.) It held that any explanation of the effect of any particular factor "is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*People v. Wright*, at p. 1143.) Tucker seeks to distinguish *Wright*, arguing that it did not examine any one of the specific factors in the instruction, and did not express an opinion as to whether the "certainty factor" was relevant. But the majority in *Wright* disagreed with the dissenting justices' reasoning (*id.* at p. 1141), which expressly pointed out the weaknesses of the certainty factor. (*People v. Wright*, 45 Cal.3d at p. 1159 ["The average juror doubtless takes it as confirming the widespread lay belief that the more certain an eyewitness is of his identification, the more likely the identification is correct. Yet that belief is apparently mistaken . . . [T]he majority of recent studies have found no statistically significant correlation between confidence and accuracy, and in a number of instances the correlation is negative . . . ."] (dis. opn. of Mosk, J.).) We will adhere to the California Supreme Court precedent upholding the use of CALJIC No. 2.92, which compels us to

14

reject Tucker's challenge to CALCRIM No. 315. (See *Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.)

Finally, even if we were to conclude the jury's consideration of a certainty factor is erroneous, its inclusion in CALCRIM No. 315 would not require reversal, whether under the state or federal constitutional standard of error. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The factor is phrased in a neutral manner (see *People v. Johnson, supra*, 3 Cal.4th at p. 1234), and it applies not only when a witness is certain of his or her identification, but also when he or she is not certain. As the People point out, the factor is one of many nonexclusive factors that the jury was told it could consider in determining eyewitness reliability; the jurors were not obligated to base their verdict on that or any other particular factor or give Robinson's identification any particular weight. Importantly, Brown's testimony, and other evidence corroborating his story, provides an independent basis for the jury's verdicts. Further, Tucker's counsel thoroughly cross-examined Robinson regarding the poor lighting conditions at the scene, her varying statements to police, her inconsistent identification of others in three different photographic lineups, and her erroneous belief that Marshall was the driver of the SUV on the night of Cleveland's murder. In closing argument, defense counsel extensively argued the weaknesses and unreliability in Robinson's eyewitness accounts and pretrial identifications. We cannot say under either prejudice standard a result more favorable to Tucker would have resulted had the certainty factor been omitted from CALCRIM No. 315. (See *People v. Ward, supra*, 36 Cal.4th at pp. 213-214.)

15

III. *Sufficiency of Evidence of Conviction for Shooting at an Inhabited Dwelling*

Tucker contends his conviction for shooting at an inhabited dwelling must be reversed because, for two reasons, the evidence is insufficient. First, Tucker argues because the sole theory of his liability was as an uncharged coconspirator in a murder, and there was no allegation that the shooting was a "natural and probable" consequence of murder generally or this murder particularly, there is no "legal predicate" for his conviction. Second, Tucker argues that assuming the government had alleged a conspiracy to shoot at an inhabited dwelling house, there was no evidence of such a conspiracy, nor was there evidence to support a finding that any of the shots fired at Cleveland hit any house. More specifically, Tucker maintains that all of the shots were fired toward Cleveland, who had taken off running, and that after the initial shots were fired at him, there was no evidence that any additional shots were fired, and no evidence tying the bullet found in Flores's mattress to the shooting.

When presented with a challenge to the sufficiency of the evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) The conviction shall stand " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

16

Section 246 makes it a felony to "maliciously and willfully discharge a firearm at an inhabited dwelling house . . . ."  Shooting at an inhabited dwelling house is a general intent crime, the elements of which are (1) acting willfully and maliciously, and (2) shooting at an inhabited house.  (*People v. Ramirez* (2009) 45 Cal.4th 980, 985 & fn. 6; *People v. Overman* (2005) 126 Cal.App.4th 1344, 1356.)  As with all general intent crimes, the question is whether the defendant intended to do the proscribed act, not whether the defendant had the "specific intent to achieve a particular result (e.g., strike an inhabited or occupied target, kill or injure)."  (*Overman*, at p. 1357.)  Accordingly, "section 246 is not limited to shooting *directly* at an inhabited or occupied target.  Rather, it proscribes shooting *either* directly at *or* in close proximity to an inhabited or occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it."  (*Id.* at pp. 1355-1356; see also *Ramirez*, at p. 990 [section 246 offense "requires that an inhabited dwelling or other specified object be within the defendant's firing range"].)  The statute does not require that the house actually be hit by gunshot.  (*Overman*, 126 Cal.App.4th at pp. 1353, 1362 [substantial evidence supported the section 246 instruction even when there was no evidence that the building was hit].)[9]

---

[9]     Thus, in *People v. Chavira* (1970) 3 Cal.App.3d 988, the defendant and his associates fired several shots at persons "congregated in front of, and on the driveway leading to" an inhabited dwelling.  (*Id.* at p. 993.)  The defendant argued that the evidence was insufficient to support his section 246 conviction because he did not fire directly at the dwelling, but only at the persons gathered outside of it.  (*Chavira*, 3 Cal.App.3d at p. 992.)  The court held that when the shooters fired a "fusillade of shots directed primarily at persons standing close to a dwelling," the jury was "entitled to

17

According to Robinson, the shooter, who she later identified as Tucker, got out of the Suburban and started shooting at Cleveland, letting off "about four or five rounds," from a point directly behind that vehicle. The shooter then "took off" after Cleveland up the street. The shots happened "[w]hen [the shooter] stood there." However, Flores heard shooting outside his house, and a bullet of the same type and caliber was found in the locker that had been in front of Flores's garage where Cleveland collapsed. Flores testified the locker had been undamaged before the shooting.

The trial court instructed the jury with CALCRIM No. 417, which informed it that a conspirator "is . . . criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy." The court instructed the jury that to convict Tucker of the offense of shooting at an inhabited dwelling, the prosecution had to prove Tucker conspired to commit the target offense of murder, and a member of the conspiracy committed shooting at an inhabited building to further the conspiracy; and the shooting was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit.

We reject defendant's arguments as to any uncharged conspiracy. It is " 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a

---

conclude that [the defendants] were aware of the probability that some shots would hit the building and that they were consciously indifferent to that result," and thus they had an intent sufficient to satisfy section 246. (*Chavira*, at p. 993.)

18

separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." ' " (*People v. Valdez* (2012) 55 Cal.4th 82, 150.)

" ' "The general rule is well settled that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. . . . *Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan.* Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design." ' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 260-261.) " 'Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.' " (*People v. Durham* (1969) 70 Cal.2d 171, 181, italics omitted; see also *People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.)

Here, the evidence amply supports Tucker's conviction. Robinson ultimately identified Tucker as the shooter, which was consistent with Brown's account. Brown testified to Neal and Tucker's planning and preparation for retaliation against Lincoln Park, including dressing in dark clothing and arranging for the vehicle, and described

19

Tucker's admission to Cleveland's shooting. Despite the forensic examiner's inability to pinpoint the bullet found in Flores's mattress to the same gun, that bullet nevertheless was of the same caliber, and that evidence plus Flores's testimony permitted the jury to rationally infer that the bullet was from Cleveland's shooting. The mattress and damaged locker were in front of Flores's garage. Under the circumstances, the jury was entitled to conclude that a reasonable person in Tucker's position, who planned to commit a murder with a firearm, would know or should know that shooting at another person running in a residential neighborhood could result in shots fired at or in close proximity to houses, and thus was a reasonably foreseeable consequence of the conspiracy to murder Cleveland. In other words, the evidence showed Tucker was shooting either directly at Flores's house or in such close proximity to it that he exhibited a conscious disregard for the probability that a bullet would strike the house and its inhabitants.

DISPOSITION

The judgment is affirmed.


                                                                    O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.


21